[No. 6413-1-III.   Division Three.   August 27, 1985.]

*In the Matter of the Marriage of* JAMES T. MATSON, *Respondent, and* JUDITH A. MATSON, *Appellant.*

*Ronald Whitaker* and *Walters, Whitaker, Finney & Falk,* for appellant.

*Donald H. Bond* and *Halverson, Applegate & McDonald,* for respondent.

McINTURFF, J.—Judith Matson appeals a court ruling which upheld the validity of a prenuptial agreement. The trial court found the property distribution was "grossly disproportionate", but, in essence, found the agreement valid because Judith Matson "was advised of her opportunity to seek advice and counsel of her own choosing".

Prior to their marriage on March 21, 1970, Judith Calvin and James Matson discussed and ultimately signed a prenuptial agreement. Mr. Matson initiated preparation of the agreement because he had children by a previous marriage and intended to preserve his separate estate in its entirety for them. His net worth was approximately $200,000; in contrast, Judith Calvin's assets consisted only of household goods and child support payments.

During the week before their marriage, the couple met

twice with an attorney who knew both of them. He was a social and political friend of Mr. Matson, in addition to having represented the Matson Fruit Company. The attorney had also met Judith Calvin socially and represented her during her marriage dissolution the previous year.

On March 17, 1970, the attorney and the couple reviewed, paragraph by paragraph, a *sample* prenuptial agreement. The attorney testified he read each paragraph verbatim and then explained each in layman's terms. The critical paragraph of the agreement, 15, provided: "This agreement is being signed only after having been read completely by each party, and after each has had an opportunity to seek advice and counsel of his or her own choosing." The attorney explained, "if either had any questions about this and wanted to have someone else look it over, or advise on it, they should do so."

The next time Mrs. Matson met with Mr. Matson and the attorney was on March 20, 1970, the evening before the wedding. They met for an hour to review and sign the final agreement. Once again the couple had an opportunity to read the agreement and ask questions. The attorney testified he did not advise Judith Calvin to seek counsel nor suggest she do so.[1]

After 13 years, the parties separated and filed for a dissolution of the marriage. Pursuant to stipulation, the validity of the prenuptial agreement was determined in a bifurcated hearing. This appeal followed.

Both parties cite Washington cases which have considered the validity of agreements between husband and wife respecting disposition of their separate and community property upon dissolution or death: *Hamlin v. Merlino,* 44 Wn.2d 851, 272 P.2d 125 (1954); *Friedlander v. Friedlander,* 80 Wn.2d 293, 494 P.2d 208 (1972); *In re Marriage of*

---

[1] In finding of fact 22, the court stated in part: "[The attorney], however, did not affirmatively advise or urge respondent, Judith A. Matson, to seek other counsel nor did he suggest to respondent that she seek counsel to review the agreement."

*Hadley,* 88 Wn.2d 649, 565 P.2d 790 (1977); *In re Marriage of Cohn,* 18 Wn. App. 502, 569 P.2d 79 (1977); and *Whitney v. Seattle–First Nat'l Bank,* 90 Wn.2d 105, 579 P.2d 937 (1978).[2]

Prenuptial agreements are not contrary to public policy, if freely and intelligently made. *Friedlander,* at 299 (citing *Hamlin*). They are generally regarded as being conducive to marital tranquility and the avoidance of future property disputes. *Friedlander,* at 301 (quoting 2 A. Lindey, *Separation Agreements and Ante–Nuptial Contracts* § 90, at 30 (rev. ed. 1967)). But, the beneficial possibilities must be obtained without abuse, particularly any overreaching on the part of the spouse who initiates the agreement.

> Parties to a prenuptial agreement do not deal with each other at arm's length. Their relationship is one of mutual confidence and trust which calls for the exercise of good faith, candor and sincerity in all matters bearing upon the proposed agreement.

*Friedlander,* at 301 (citing *Bauer v. Bauer,* 1 Or. App. 504, 464 P.2d 710 (1970)); 2 A. Lindey § 90, at 38, 41. Because of this unique bargaining position between future spouses, these agreements must be more closely scrutinized than if

---

[2]The three cases which follow *Hamlin* and *Friedlander* make reference to the independent advice requirement, but can be distinguished because the underlying agreements were basically fair to the disfavored spouse.

In *Hadley,* the wife sought independent advice but failed to follow through with additional information needed by her attorney in order to provide a legal opinion. The court found the husband had sufficiently demonstrated his good faith, candor and sincerity in his dealings with his wife. *Hadley,* at 655.

In *Cohn,* the court also found the husband had met his burden of proving good faith in dealing with his wife. The Cohn marriage lasted only 2 years, and the wife did receive half the equity in the family home and half of the community property. In *Cohn,* the property settlement agreement was prepared by Mrs. Cohn's own attorney. The court concluded it would have been unfair to penalize Mr. Cohn for Mrs. Cohn's failure to request further information.

Finally, in *Whitney,* the court once again construed an agreement basically fair to the wife, the disfavored spouse. The court said at page 111:

> Because the agreement here was fair and reasonable, and because petitioner has not shown fraud or overreaching, there is no absolute requirement that the wife have acted upon the competent, independent advice of counsel, or that she be specifically informed of her right to seek the same.

the moving party had the benefit of independent counsel.[3]

> To render such an agreement valid there must be a fair and reasonable provision for the wife, or, in the absence thereof there must be a full, frank disclosure of the future husband's property and his worth. This is not to say that she must know the *exact* financial status of his resources. However, she must at least have a full and fair disclosure of all material facts relating to the amount, character and value of the property involved so that she will not be prejudiced by the lack of information, but can intelligently determine whether she desires to enter the prenuptial contract. . . .
>
> Further, the prospective spouse must sign the agreement freely and voluntarily on *independent advice* with full knowledge of her rights.

(Citations omitted.) *Friedlander*, at 302–03.

Even though there was full disclosure of Mr. Matson's property and its worth, and although Mrs. Matson knew she could seek other advice, we will not be constrained by those two criteria in our review of the validity of that document.

As stated in *Hamlin*, at 866–67:

> In the case before us, however, we think that the unlimited power, which the contract purported to give Angelo to unilaterally secure for his separate estate, property which would otherwise belong to the community, indicated unfairness and a breach of trust by reason of the existing confidential relationship of the parties to the proposed marriage, *and imposed upon Angelo the*

---

[3] "Generally, where the dependent spouse has not been represented by independent counsel, the parties' separation or property settlement agreement will be set aside by the courts, unless the supporting spouse can affirmatively demonstrate that he or she has dealt fairly with the dependent spouse.

" . . .

"While the lack of independent counsel by a complaining spouse is usually, by itself, not a basis for vitiating a spousal agreement, as long as the agreement is found to be basically fair, the courts will tend to review such agreements more closely than if the attacking party had the benefit of independent counsel." 1 A. Lindey, *Separation Agreements and Ante–Nuptial Contracts* § 3, at 3–18, 3–22 (1983).

*burden of proving that Lucia fully understood the nature and significance of the contract . . .*

(Italics ours.) *See also Christian v. Christian,* 42 N.Y.2d 63, 365 N.E.2d 849, 855, 396 N.Y.S.2d 817 (1977).[4] Here, there is no testimony which proves Mrs. Matson understood the legal significance or consequences of the agreement, *i.e.,* that under the terms of the agreement it was probable she would receive nothing in the event of dissolution, regardless of the duration of the marriage, except sustenance and shelter (assuming Mr. Matson remained in the same occupation and there was no commingling of assets).[5]

Indicative of Mrs. Matson's misperception of the consequences of the agreement is her testimony she trusted her husband and the attorney "beyond question." In regard to community property, Mrs. Matson was asked:

Q Did you understand then that if that separate property of his changed form, that it would still remain his separate property?

A My understanding from [the attorney's] explanation was that anything that we did as a couple after the time we signed that paper would be community property.

In a Florida decision involving a fact pattern similar to the instant case, the court held that circumstances surrounding execution of the prenuptial agreement, including its disproportionate terms, militated against fairness and were sufficient to support presumption of undue influence and overreaching. *Lutgert v. Lutgert,* 338 So. 2d 1111 (Fla. Dist. Ct. App. 1976). There, the agreement provided for $1,000 per month support payments, and waiver of rights to the husband's separate property valued in excess of $3,000,000. The agreement was first shown to the wife the day before they were to be married and signed immediately

---

[4]There, under similar facts, the court stated there must be full disclosure of all the relevant facts and also their *contextual significance.*

[5]See footnote 7.

before the wedding. The court voided the agreement because it found no evidence of voluntariness on the part of the wife:

> Surely, particularly at the last moment, a prospective wife ought not be forced into a position of being "bought" at the price of losing all if she does not agree to a grossly disproportionate benefit to the husband should she leave him under any and all circumstances, any more than she should be permitted to "sell" herself at zero hour for an agreement resulting in a grossly disproportionate gain to her upon the same eventuality. Along with public policy considerations this is the very reason why "fairness" is the polestar in these agreements; and fairness would certainly include an opportunity to seek independent advice and a reasonable time to reflect on the proposed terms.

*Lutgert,* at 1116. *See also Plant v. Plant,* 320 So. 2d 455 (Fla. Dist. Ct. App. 1975); *Norris v. Norris,* 419 A.2d 982 (D.C. 1980).

■ Using the foregoing concepts where courts construed fundamentally unfair agreements, we conclude this prenuptial agreement does not meet the standard of fairness test for several reasons: First, there was a reasonable expectation for Mrs. Matson to assume the attorney would protect her interests. They had known each other socially, he had represented her during her prior dissolution, and there was never any indication to her that he, in fact, was representing only Mr. Matson's interests.[6]

Second, the attorney never advised her that the practical effect of the agreement was to eliminate any accumulation

---

[6]The attorney responded to questions as follows:

"Q . . . I assume that you consider Jim Matson to be your client?

"A Yes.

"Q It was his interests you were looking out for?

"A Well, I think I was trying to draw an instrument that would accomplish what they were willing to agree to.

"Q And what Jim wanted and you thought he should have?

"A Yes."

of community property.[7] Even though Mr. Matson used his separate property to pay the community's living expenses, he did not commingle any other income or assets; thus, the sole item of community property acquired during 13 years of marriage was real estate in Sun River, Oregon.[8] Community property was the only means by which Mrs. Matson could secure her financial future, because she subjugated her career potential to supporting her husband in his career and fulfilling family obligations. Without knowing the serious legal consequences of this prenuptial agreement, it was impossible for Mrs. Matson to make a knowing and voluntary decision to sign, and thereby be bound to, the provisions of the writing.

Third, the disparity between the parties in business experience and assets mandated a more vigorous urging by the attorney that Mrs. Matson seek independent advice.

---

[7]The prenuptial agreement provided, in part:

"7. That property listed as belonging to James T. Matson shall remain HIS SOLE AND SEPARATE PROPERTY AT ALL TIMES and Judith A. Calvin hereby releases and relinquishes to him all present and all future claims or rights therein.

"8. It is recognized that the property of either party may be sold, exchanged or otherwise changed in character. All property subsequently acquired therefrom shall remain AT ALL TIMES THE SOLE AND SEPARATE PROPERTY of the one who owned the original asset. It is the intent hereof that any future property resulting from the sale, exchange or other disposition of the above described assets shall be the separate property of the one owning the original asset.

"9. All appreciation in value, all income and all earnings of said separate property shall remain the SOLE AND SEPARATE PROPERTY AT ALL TIMES of the owner of the property. All property acquired with the income and earnings of the separate property shall become and shall remain at all times the sole and separate property of the owner of the property producing such income and earnings.

"10. It is recognized that James T. Matson may devote substantial portions of his time to the management and reinvestment of his separate property above described and that which is acquired hereafter. No claim shall ever be made that such activities create any community property claim or interest against such separate assets. Judith A. Calvin hereby waives, releases and relinquishes any claim arising from the devotion of James T. Matson's time to management and reinvestment of his separate property which is now owned and hereafter acquired. It is recognized by both parties that James T. Matson will have to spend a portion of his earnings for the operation of their home and for routine living and recreation expenses and that such represents a fair and reasonable allocation to the community efforts."

[8]The value of this property is not before us.

She had some secretarial experience and separate property consisting only of household furnishings and child support payments. In contrast, Mr. Matson had successfully operated a fruit ranch, been elected to the State Senate, and had assets in excess of $200,000.

Fourth, the timing of the agreement negated any inclination Mrs. Matson may have had to secure independent advice. The first meeting to review a sample agreement took place 1 week before the wedding; the signing of the final agreement was done the evening before the wedding. Mr. Matson admitted that any hesitation by his future wife would have resulted in at least a delay of the wedding. Obviously, the night before her wedding a bride has concerns that seem more important and immediate than the potential dissolution of her marriage and waiver of her interest in future community property.

Community property law dictates husband and wife shall share equally in the accumulation of property during marriage. RCW 26.16.030. Where a contractual agreement attempts to limit or, as in this case, totally eliminate community property rights, equity will zealously and scrupulously examine it for fairness. The burden is upon the favored and represented spouse to prove a knowing and intelligent waiver of community property rights. One method of meeting this burden is to affirmatively urge the unrepresented spouse to seek independent counsel, thus assuring that the waiver is done with full knowledge.[9]

Under these circumstances we find it would be unfair, unjust and inequitable to enforce this prenuptial agreement. The evidence fails to establish Mrs. Matson realized the legal significance of her waiver. It is void.

---

[9]As better stated in *Whitney v. Seattle–First Nat'l Bank,* 90 Wn.2d 105, 111–12, 579 P.2d 937 (1978):

"This holding is not meant to dissuade counsel from recommending that independent counsel be consulted in appropriate cases. . . . The presence of advice from independent counsel is a desirable cautionary step, however, where there is a possibility that the fairness or reasonableness of the agreement will be subject to later attack."

The judgment of the Superior Court is reversed.

GREEN, C.J., and THOMPSON, J., concur.

Review granted by Supreme Court November 8, 1985.