[No. 52049-6. En Banc. December 31, 1986.]

*In the Matter of the Marriage of* JAMES T. MATSON,
*Petitioner, and* JUDITH A. MATSON, *Respondent.*

*Donald H. Bond* (of *Halverson & Applegate, P.S.*), for
petitioner.

*Ronald F. Whitaker* (of *Walters, Whitaker, Finney & Falk*), for respondent.

DOLLIVER, C.J.—Petitioner James Matson challenges a Court of Appeals decision voiding his prenuptial agreement with respondent Judith Matson. We affirm the Court of Appeals and remand the case for further proceedings.

Judith Matson worked for James Matson as a secretary during the 1969 legislative session when he was a member of the Washington State Senate. Judith subsequently moved to Yakima and filed for divorce from her husband in July 1969. James recommended Judith use his personal attorney as her attorney for the divorce. This attorney was also petitioner's business attorney and friend.

In the early part of 1970, James and Judith became engaged to marry. During this same period, around February, James began discussing his desire for a prenuptial agreement with Judith. He told her he wanted to protect the interest of his three sons from his previous marriage in his estate. James' specific intent of making certain everything obtained in the future would be separate and go to his sons was not relayed to respondent.

In early March 1970, James asked his attorney to prepare a prenuptial agreement for the upcoming marriage. The attorney testified he was representing James in this transaction. Shortly after, in the week before their marriage, the couple met with the attorney on two occasions to discuss prenuptial agreements. The first meeting on March 17, 1970 (4 days before the wedding) was to discuss the nature of the prenuptial agreement, the need for it, the effect of it, and the property involved. The attorney and the couple reviewed, paragraph by paragraph, a sample prenuptial agreement.

On the eve of the wedding, the couple met again to execute the prenuptial agreement. The attorney had drafted a prenuptial agreement which provided all income and earnings derived from petitioner's separate property would remain separate, as would any increases in value to that

property. At this time, the couple was given separate copies of the agreement to read through before meeting with the attorney. The attorney did not advise Judith to seek independent counsel but did say to both parties, if "[y]ou want somebody else to look at this, fine." In addition, paragraph 15 of the agreement stated (just above the couple's signatures):

This agreement is being signed only after having been read completely by each party, and after each has had an opportunity to seek advice and counsel of his or her own choosing.

After being advised of the nature and value of the other's property, both parties signed the prenuptial agreement. Judith did not receive a copy of the agreement. James testified that if Judith had objected to signing the agreement on the eve of the wedding it would have been delayed until an unobjectionable agreement could have been prepared. The couple was married the next day on March 21, 1970.

At the time of the agreement, James owned one–half of the shares of stock in the Matson Fruit Company and real estate in Yakima County consisting of approximately 44 acres (part in orchard). This property was worth about $330,000. Petitioner's net worth, as of the trial date, was approximately $830,000. Judith, on the other hand, owned only her personal effects.

In June 1983, James Matson petitioned for dissolution of the couple's marriage. He requested the court divide their property in accordance with the prenuptial agreement. Judith Matson then challenged the validity of that agreement.

Following a hearing limited to this issue, the trial court upheld the validity of the prenuptial agreement even though it found the agreement "grossly disproportionate in favor of the petitioner . . ." The Court of Appeals reversed, holding the agreement void. The key issue before us is whether either court applied the appropriate legal standard regarding prenuptial agreements.

A prenuptial agreement, created freely and intelligently,

is regarded as "conducive to marital tranquility and the avoidance of disputes about property in the future." *Friedlander v. Friedlander,* 80 Wn.2d 293, 301, 494 P.2d 208 (1972). Although prenuptial agreements are not directly authorized by statute, we have long recognized the right of the members of a prospective marital community to contract between themselves regarding their property. Washington State Bar Ass'n, *Community Property Deskbook* § 18.1 (1977); Comment, *Antenuptial and Postnuptial Contracts in Washington,* 54 Wash. L. Rev. 135, 137–38 (1978). If fair and fairly made, we have held prenuptial agreements between competent parties to be valid and binding. *Whitney v. Seattle–First Nat'l Bank,* 90 Wn.2d 105, 579 P.2d 937 (1978); *Hamlin v. Merlino,* 44 Wn.2d 851, 272 P.2d 125 (1954).

Preliminarily we observe that if a prenuptial agreement merely operated to direct that the separate property of each party was to remain the separate property of each party, RCW 26.09.080, which deals with disposition of property and liabilities, would control and all property (separate and community) would be before the court for a just and equitable distribution. However, if, as here, the prenuptial agreement operates to waive the marital partners' statutory right to an equitable distribution, a different analysis will take place. A prenuptial agreement of this kind must be achieved only without the attendant dangers of abuse and overreaching by the dominant party. *Friedlander,* at 301.

■ During the past 30 years, we have developed a 2–pronged analysis for evaluating the validity of a prenuptial agreement. First, the court must decide whether the agreement provides a fair and reasonable provision for the party not seeking enforcement of the agreement. If the court makes this finding, then the analysis ends and the agreement may be validated. This was the situation in *Whitney.* Because the agreement was fair and reasonable and because the challenging party had not shown fraud or overreaching, there was no need to advance to the second prong of

the analysis. *Whitney v. Seattle–First Nat'l Bank, supra* at 111.

The second prong of this analysis involves two tests derived from our past cases. *Whitney,* at 110. *See In re Marriage of Hadley,* 88 Wn.2d 649, 565 P.2d 790 (1977); *Friedlander v. Friedlander, supra; Hamlin v. Merlino, supra.* The two tests are:

> (1) whether full disclosure has been made by [the parties] of the amount, character and value of the property involved, and (2) whether the agreement was entered into fully and voluntarily on independent advice and with full knowledge by [both spouses of their] rights. . . .

*Whitney,* at 110 (quoting *Hadley,* at 654).

Although the earlier cases of *Friedlander* and *Hamlin* appeared to require each party be represented by independent counsel, we indicated in *Whitney* that the actual standard should be applied on a case–by–case basis.

> A clear and important distinction certainly exists between saying that in particular circumstances a transaction could not be supported in the absence of independent advice, and saying that a general rule of equity exists which makes independent advice indispensable to the validity of transactions between persons occupying a fiduciary relationship.
>
> Where it is plainly shown that a transaction was fair and free from objectionable influence, and especially where the person supposed to have been at a disadvantage is shown to have been of strong and independent mind and in a position to form an intelligent judgment, a requirement that in addition he must have had independent advice "would seem to be arbitrary and unnecessary."

*Whitney,* at 109 (quoting Annot., *Independent Advice as Essential to Validity of Transaction Between Persons Occupying a Confidential or Fiduciary Relationship,* 123 A.L.R. 1505, 1512–13 (1939)).

We further observed:

> "Parties to a [prenuptial] agreement do not deal at arm's length with each other. Their relationship is one

of mutual trust and confidence. They must exercise the highest degree of good faith, candor and sincerity in all matters bearing on the proposed agreement."

*Whitney,* at 108 (quoting *Hamlin,* at 864).

The demise of the rule in this state that the husband was deemed to be the sole manager of all community property in favor of the "equal manager" concept (*see* RCW 26.16-.030) has not resulted, however, in the demise of a fiduciary duty. Rather, the duty has become gender neutral. *Cf.* RCW 26.16.210. To uphold the validity of a prenuptial agreement under Washington law still requires full disclosure by both parties of all aspects of each party's assets, with the agreement entered into fully and voluntarily on independent advice and with full knowledge by each spouse of the individual rights of each party. *Whitney,* at 110.

In the second prong of the prenuptial agreement test, the circumstances or procedure surrounding the execution of the agreement are the crucial factors. The bargaining positions of the parties, sophistication of the parties, presence of independent advice, understanding of the legal consequences and rights, and timing of the agreement juxtaposed with the wedding date are some of the factors involved in the circumstances surrounding the document signing. Thus, even though our state laws have, in theory, reached equality of the sexes (*see, e.g.,* Const. art. 31 (Equal Rights Amendment) and RCW Title 26 (domestic relations)), the status of the relationship between the two parties entering into the agreement requires a procedural fairness necessary to allow both parties the knowledge and sufficient opportunity to act voluntarily and intelligently. The circumstances involved in each case become crucial.

An example of a court applying a procedural fairness test on a case–by–case basis is found in *In re Marriage of Knoll,* 65 Or. App. 484, 671 P.2d 718 (1983). In *Knoll,* the wife challenged the validity of the prenuptial agreement. The court found the agreement valid judged in light of the circumstances in the case and the wife's range of experience. Important facts in the court's decision were: (1) the wife

was advised of the necessity of a prenuptial agreement at least 9 months before the wedding and knew and understood the purpose of the agreement; (2) she had been given a copy of the agreement at least 7 months before the wedding; (3) she was advised on numerous occasions by her husband's attorney to *seek* independent counsel; (4) she had an excellent understanding of her husband's assets because she handled the bookkeeping and payroll for her husband's businesses and was in charge of 10 of his business checking accounts; and (5) both parties had to reaffirm and sign the agreement 3 years later because they had lost the original document. The court decided that the failure to provide the wife with a detailed explanation of the agreement and her failure to follow advice and seek out independent counsel was offset by her knowledge and the procedural fairness provided her.

The court in *Knoll* found the wife's advance knowledge of the agreement, subsequent advice to seek independent counsel, and her extensive understanding of her husband's assets put her in a fair position to sign the agreement freely and intelligently. The determination of the fairness of a prenuptial agreement depends on the specific circumstances and the independent knowledge of the challenging spouse. Thus, all circumstances leading to the execution of the agreement should be within the court's review in evaluating the procedural fairness of the agreement.

The Court of Appeals stated the beneficial aspects of a prenuptial agreement must be obtained without abuse, and in particular, without any overreaching on the part of the spouse initiating the agreement. *In re Marriage of Matson,* 41 Wn. App. 660, 663, 705 P.2d 817 (1985). This is consistent with the legal standard in this state. The court held the agreement void for several reasons (all involving the circumstances leading up to the execution of the agreement): (1) the reasonable expectation on Judith's part that her husband's attorney would protect her interests; (2) the attorney never advised Judith that the practical effect of the agreement was to eliminate any accumulation of com-

munity property; (3) the disparity between the parties in business experience and assets mandated a more vigorous urging by the attorney that Judith seek independent advice; and (4) the timing of the agreement negated any inclination respondent may have had to secure independent advice. *In re Marriage of Matson,* at 666–68. The court concluded that when an agreement, as here, attempts to eliminate, totally, community property rights, the court must zealously and scrupulously examine it for fairness. We agree.

The trial court concluded Judith signed the prenuptial agreement voluntarily because she had been informed of her opportunity to independent advice of counsel. It also apparently considered the fact that she had previously worked as a secretary in a Yakima law firm and had more access to counsel than someone without that experience.

Although the trial court found the respondent had been specifically informed and advised of her right to seek independent counsel and this finding is undisputed, we concur with the Court of Appeals and find the circumstances surrounding her signing of the agreement did not afford her with sufficient opportunity to sign, intelligently and voluntarily, the agreement.

As the trial court found, the prenuptial agreement was grossly disproportionate in favor of petitioner. In fact, after over 13 years of marriage, the agreement would serve to deny respondent any of her common law and statutory rights for a just and equitable distribution of property. Specifically, the agreement allowed James to devote substantial portions of his time to the management and reinvestment of his separate property, while all appreciation in value, all income, and all earnings of his separate property remained his separate property throughout. Paragraph 14 of the prenuptial agreement then acted to bar Judith from making any claim against or seeking any rights in James' separate property.

The time between the presentation and signing of the agreement with the actual wedding date was extremely

short. The first meeting to review a sample agreement was on March 17, 1970, and the signing of the final agreement was on the evening of March 20, 1970 (the night before the wedding). Judith did not receive a copy of the agreement. James testified the wedding would have been delayed until an unobjectionable agreement could have been drawn up. Under those circumstances, although Judith had been advised of her right to counsel, she had no reasonable opportunity to seek independent counsel for advice as to the legal consequences of the agreement.

In viewing the circumstances surrounding execution of this agreement, we find Judith did not have an opportunity, freely and intelligently, to waive her rights to a just and equitable division of property. The circumstances here were dramatically unlike those in the *In re Marriage of Knoll*, 65 Or. App. 484, 671 P.2d 718 (1983) case where the spouse had plenty of time to seek advice, numerous specific suggestions to seek independent advice over this period, and a strong understanding of the businesses and assets involved. Here, Judith had an extremely short period of time in which to consider the prenuptial agreement; she received no specific verbal encouragement to seek independent advice; and from the record it is not apparent she had even a minimal understanding of the legal consequences of the rights she was signing away.

Unlike the spouse in *In re Marriage of Hadley*, 88 Wn.2d 649, 565 P.2d 790 (1977), who had time to seek independent advice and did so but failed to follow through with the necessary additional information, Judith's time to seek advice was limited in time as well as by the prospect of a delayed wedding. Also unlike the attorney in *Hadley,* James' attorney was not the "family" attorney and represented *only* the petitioner.

Unlike the spouse in *In re Marriage of Cohn,* 18 Wn. App. 502, 569 P.2d 79 (1977), Judith did not have her own attorney draw up the agreement and did not receive half the equity in the family home and half of the community property. Unlike the spouse in *Whitney v. Seattle–First*

*Nat'l Bank,* 90 Wn.2d 105, 579 P.2d 937 (1978), Judith's agreement was found to be grossly disproportionate instead of fair.

We still strongly urge both parties to seek advice from independent counsel before signing a premarital agreement. This would provide the best opportunity for both sides to receive objective and independent information regarding the legal consequences of the agreement. Because of the close and confidential nature of the relationship of a soon to be married couple, we will continue to insist, however, that each party enter into a premarital agreement intelligently and voluntarily before we will bind the parties to an agreement by which one party forgoes its statutory and common law rights.

In light of the circumstances in the present case, we find respondent Judith Matson did not intelligently and voluntarily sign the prenuptial agreement. Because of this, we affirm the Court of Appeals decision and remand this case to the trial court for further proceedings.

UTTER, CALLOW, and DURHAM, JJ., and CUNNINGHAM and HOROWITZ, JJ. Pro Tem., concur.

PEARSON, J. (concurring)—I concur with the majority's analysis and result in this case. I take this opportunity, however, to express my opinion on a proposition never before considered either by this court or the commentators familiar with Washington's dissolution law; namely, that a trial court may ignore a validly executed prenuptial agreement if necessary to achieve a "just and equitable" disposition of the parties' assets and liabilities.

Support for this proposition is found in RCW 26.09.080, which provides that "[i]n a proceeding for dissolution of the marriage . . . the court shall . . . make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear *just and equitable* after considering all relevant factors . . ." (Italics mine.) The relevant factors include:

(1) The nature and extent of the community property;
(2) The nature and extent of the separate property;
(3) The duration of the marriage; and
(4) The economic circumstances of each spouse . . .

RCW 26.09.080(1)–(4).

Notably absent from this list of factors is the existence of a prenuptial agreement. The statute simply commands a trial court to make a "just and equitable" disposition of assets and liabilities after considering the aforementioned factors. In my opinion, the clear import of this command is that a trial court may ignore a valid prenuptial agreement if its enforcement would result in an unjust and inequitable disposition.

At first glance, this interpretation of RCW 26.09.080 might seem to conflict with the language of RCW 26.09-.070(3), which governs "separation agreements", a term which arguably encompasses prenuptial agreements. Even if this proposition is correct, the two provisions are reconcilable.

RCW 26.09.070(3) provides that a separation contract "shall be binding upon the court *unless* it finds, after considering the economic circumstances of the parties and any other relevant evidence . . . that the separation contract was *unfair* at the time of its execution." (Italics mine.) This provision does not address the validity of a separation contract in the same sense as the decisions spawned by *Friedlander v. Friedlander,* 80 Wn.2d 293, 494 P.2d 208 (1972), as different considerations apply.

Under *Friedlander* and its progeny, the validity of a prenuptial agreement turns on:

(1) whether full disclosure has been made by [the parties] of the amount, character and value of the property involved, and (2) whether the agreement was entered into fully and voluntarily on independent advice and with full knowledge by [each spouse of their] rights. . . .

*Whitney v. Seattle–First Nat'l Bank,* 90 Wn.2d 105, 110, 579 P.2d 937 (1978) (quoting *In re Marriage of Hadley,* 88

Wn.2d 649, 654, 565 P.2d 790 (1977)).

RCW 26.09.070(3), on the other hand, makes enforcement of a "valid" separation contract turn on whether the agreement was "unfair at the time of its execution" but only "*after* considering the economic circumstances of the parties and any other relevant evidence . . ." This provision permits the trial court to make the fairness determination with the benefit of all available facts, including the current economic circumstances of the parties. If, from the time of its execution, the contract prevented the accumulation of community property, and one spouse neither had accumulated separate property prior to the marriage nor had the opportunity to accumulate separate property during the marriage, the prenuptial agreement could be deemed unfair at execution, even if otherwise valid, if it would result in an unfair disposition upon enforcement.

As the foregoing demonstrates, RCW 26.09.070 and RCW 26.09.080 can be construed consistently with each other. Regardless of whether a prenuptial agreement exists that is "valid" under *Friedlander* and its progeny, a trial court must make a disposition of property that would be just and equitable under the factors listed in RCW 26.09.080. If, with benefit of the knowledge that enforcement of the agreement would work injustice, the trial court concludes that the agreement was unfair at the time of its execution, the agreement is not binding and the trial court must make a just and equitable disposition.

This does not mean, of course, that property must be divided equally, for there may be considerations, such as the duration of the marriage, that counsel against an equal disposition. Furthermore, although the agreement would not be binding, it may serve as a valuable indication of intent, for example where one party desires to keep property within his or her family. In such a case, the trial court could award the designated property to that spouse and give the other spouse either different property or a lien against income or profits. As long as the result was just and equitable, the trial court would have great flexibility in

shaping the contours of the final award.

Because the economic circumstances of the parties to a marriage are critical under the foregoing analysis, the preferable procedure for resolving a challenge to a prenuptial agreement is to avoid bifurcation of the challenge from the actual divorce proceeding. While the Court of Appeals may, and in this case did, accept discretionary review of a trial court's pretrial ruling on the validity of an agreement, such review is without the benefit of findings concerning the economic circumstances of the parties and the appellate courts must render a decision in a vacuum. Therefore, I disagree with the decision of the Court of Appeals to accept discretionary review of the interlocutory order.

On the other hand, an appeal of a decision affecting a prenuptial agreement after factual findings are entered in the divorce proceeding generally ensures the existence of an adequate factual record for purposes of appeal. While such a record is not critical where the reviewing court makes a threshold determination of validity under *Friedlander,* such a record is absolutely necessary to make the fairness determination under RCW 26.09.070(3), and regardless of the reviewing court's *Friedlander* determination, the fairness issue is still open.

In this case, the majority holds that the prenuptial agreement is invalid because Judith Matson "did not have an opportunity, freely and intelligently, to waive her rights to a just and equitable division of property." Majority, at 487. Accordingly, I concur. In doing so, however, I express strong doubt as to whether Judith Matson could ever waive her right to a just and equitable disposition. As stated above, I believe RCW 26.09.080 demands a just and equitable disposition regardless of the existence of a prenuptial agreement, unless one can say, after determining the effect enforcement of the agreement would have, that the agreement was fair from the time of execution. In this case, we lack an adequate factual record from which Judith Matson's economic circumstances can be determined. Suffice it to say that an agreement which, by its terms, would leave

one spouse virtually penniless after 13 years of marriage can hardly be deemed fair. Accordingly, I do not believe such an agreement would be binding under RCW 26.09-.070(3).

REVELLE, J. Pro Tem., concurs with PEARSON, J.

SOULE, J.* (concurring in the result)—I concur in the result reached by the majority and particularly because Judith Matson was not afforded a sufficient opportunity to sign the agreement intelligently and voluntarily.

It should be noted that in discussing the application of the standards set by RCW 26.09.070(3) and .080 to an otherwise "valid" prenuptial agreement the concurring opinion addresses an issue which was not raised by counsel either in the briefs or by way of argument.

To the extent that a prenuptial is to be judged by the standards which the statute provides for separation agreements that standard is contained in RCW 26.09.070(3) and sets the time of execution as the point as of which fairness *is to be determined.*

The shift of focus, by the concurring opinion, from fairness at the time of execution to fairness "from the time of execution" suggests an enlargement of the power of the court to modify or rewrite a contract which was fair at the time of its execution but, because of unexpected events occurring thereafter, has had unanticipated results. The existence of this power is at least debatable and is one which traditionally the court lacks.

---

*Judge Hardyn B. Soule is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amend. 38).