IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No. 34227-1-III |
| PRISCILLA DIANE HERR, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SHIZUO YAMADA, | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Shizuo Yamada appeals from the trial court's property distribution following trial of this dissolution proceeding, arguing that the prenuptial agreement signed by the parties was invalid because it substantially favored his wife. Given the decision by the parties to apply Washington law rather than California law, we affirm.

FACTS

Mr. Yamada and Priscilla Herr were married in California in 1986. Shortly before the marriage, while the dissolution of his prior marriage was pending, the couple signed a prenuptial agreement prepared by Ms. Herr. She worked as a legal secretary and testified that she received some assistance from an attorney at the law firm.[1]

---

[1] The trial judge expressly found that statement not credible. Clerk's Papers (CP) at 9-10.

No. 34227-1-III
*In re the Marriage of Herr v. Yamada*

The 1986 agreement states:

> For good and valuable consideration received, Bob S. Yamada
> ("Bob"), does hereby give his written consent to provide support to Priscilla
> Diane McCracken Moore ("Priscilla") after Bob and Priscilla are legally
> married, such support to include housing as Priscilla is willing to live with
> Bob and all applicable expenses pertaining to such housing, and whatsoever
> food, clothing and living expenses are deemed agreeable to Priscilla and
> Bob.
> RESOLVED FURTHER, such support to continue as long as Bob
> and Priscilla are legally husband and wife.
> RESOLVED FURTHER, that Bob consents to such support whether
> Priscilla engages in income-producing endeavors or not.
> REVOLVED FURTHER, Bob hereby agrees that property earned by
> Priscilla that constitutes community property under the laws of the State of
> California shall be Priscilla's sole and separate property.
> Bob understands that upon execution of this document, he is
> relinquishing any and all claim to any part, portion or whole of any
> earnings, inheritance, or proceeds of Priscilla for any reason, including his
> support (unless he becomes incapable of providing for his own support),
> obligations, debts, contracts, arrangements, or understandings.

Clerk's Papers (CP) at 224. Mr. Yamada signed the agreement without consulting an

attorney.

The couple married in California shortly after the dissolution of Mr. Yamada's

marriage was final. During the course of the marriage, the couple signed two additional

"Declarations of Responsibility." One of them was signed in 1987; it declared that Mr.

Yamada would be solely responsible for all of his debts and obligations. CP at 10. He

also signed a declaration in 1992 in which he again assumed sole responsibility for his

own debts and obligations and acknowledged the 1986 agreement as a "prenuptial

2

agreement." Report of Proceedings (RP) at 40-41.[2] The parties primarily kept their finances separate during the marriage.

Ms. Herr purchased two properties, in both of the couple's names, in Washington shortly after the 1987 declaration was signed. The properties were for investment purposes and were near where Ms. Herr's adult daughter lived. Mr. Yamada contributed to the purchase $20,000 he received from the United States government as reparation for being confined in an internment camp during World War II. In 1994, he signed quitclaim deeds giving up his interest in the two parcels. She later sold the two parcels in order to purchase a house.

Ms. Herr moved to Washington on January 1, 1995. Mr. Yamada remained in California and would visit Ms. Herr one to three times a month during the next six years. He initially sent monthly support payments to her of $1,200, and then $1,500 per month until he moved up to Washington in 2001. He began receiving retirement benefits in 2005.

Ms. Herr petitioned the Franklin County Superior Court on March 27, 2013, to dissolve the marriage. The court set a bifurcated trial, with the first portion to determine the validity of the three financial documents. Ms. Herr's counsel told the court that although the parties entered into the agreements in California, they "want this matter

---

[2] Ms. Herr's counsel characterized the 1992 declaration as a separation agreement.

3

decided under Washington law." RP at 7. Ms. Herr argued for enforceability, noting that the parties had lived by the documents for a quarter century, while Mr. Yamada contended that the agreement was unconscionable. At the conclusion of argument, the court took the matter under advisement after noting that the burden of proof was by clear, cogent, and convincing evidence.

The court issued a letter opinion that began by expressing disbelief that it was finding such an "amateurish" agreement enforceable, noting that no attorney would prepare such a document or counsel another to sign it. CP at 9-10. However, while noting that the agreement was probably procedurally unfair since Mr. Yamada was not represented by counsel, the trial court concluded that it was not substantially unfair and that Mr. Yamada apparently thought it was a "good deal" when he signed it. CP at 12. The court also found that the 1987 and 1992 declarations were not prenuptial agreements and had no bearing on the case.

A subsequent order entered after the second trial divided the property. Noting that nearly all assets were Ms. Herr's separate property, the court awarded her those items, but gave much of the meager community property to Mr. Yamada. Ms. Herr was ordered to return the $20,000 Mr. Yamada had paid toward the original Washington property purchase.

Written findings were entered. Mr. Yamada timely appealed to this court. After initial review of the briefing, this court directed supplemental briefing concerning

4

whether California law might govern the validity of the 1986 prenuptial agreement. A panel later heard oral argument on the case.

## ANALYSIS

The appeal argues that the court erred in not identifying the burden of proof in its written findings and in finding the prenuptial agreement enforceable, thereby dividing the property in accordance with the prenuptial agreement. We first address this court's question concerning California law before turning to those presented by the appellant.

### California Law

The prenuptial agreement was executed in California and does not include a choice of law provision, although it defines community property in terms of California law.[3] The parties did not plead California law and, instead, expressly asked the trial court to apply Washington law. Although the trial court was not bound to that decision, it did not err in using Washington law.[4]

As a general principle, Washington courts will apply the law of the jurisdiction specified in a contract. *E.g.*, *McKee v. AT&T Corp.*, 164 Wn.2d 372, 384, 191 P.3d 845 (2008) (citing *Erwin v. Cotter Health Ctrs., Inc.*, 161 Wn.2d 676, 695-696, 167 P.3d

---

[3] Nothing in our record indicates whether California employs definitions of community and separate property similar to Washington or whether the trial court considered California law in characterizing any property.

[4] Washington law certainly governed the dissolution trial, but that did not mean that the trial court necessarily had to apply Washington law to assess the validity of the 1986 prenuptial agreement.

1112 (2007)). When a party desires the trial court to consider the law of another jurisdiction, that party must plead that law. CR 9(k). If foreign law is not pleaded, the trial court will apply Washington law unless doing so would result in a manifest injustice. CR 9(k)(4). However, that provision does not apply to the law of other United States jurisdictions. Accordingly, trial courts may apply the laws of other states without regard to whether it was pleaded. *Id.*

California adopted the Uniform Premarital Agreement Act on January 1, 1986.[5] Cal. Fam. Code §§ 1600, 1601. As it existed when the parties entered into their prenuptial agreement, California law provided[6] that:

> (a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following:
> (1) That party did not execute the agreement voluntarily.
> (2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party:
> (A) That party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party.

---

[5] Washington has not adopted the uniform act, but our court has noted that some of its provisions are consistent with Washington law. *See Estate of Crawford*, 107 Wn.2d 493, 498, 730 P.2d 675 (1986).

[6] Following a 2001 revision, premarital agreements in California are not enforceable if they are unconscionable or they are not executed voluntarily. Currently, California requires that a court finds five elements to ensure voluntariness; one of these elements is representation by an attorney (or waiving representation in writing). Cal. Fam. Code § 1615(c)(1)-(5). However, the revisions in § 1615(c) are not retroactive. *See In re Marriage of Hill & Dittmer*, 202 Cal. App. 4th 1046, 1057, 136 Cal. Rptr. 3d 700 (2011).

(B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided.

(C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

Former Cal. Fam. Code § 1615 (1986); *see In re Marriage of Bonds*, 24 Cal. 4th 1, 14-15, 5 P.3d 815, 99 Cal. Rptr. 2d 252 (2000).

Although the current California law on the subject is probably more favorable to Mr. Yamada, the outcome under the version in effect at the time of this agreement is unclear. The parties understandably had strategic reasons for proving their case under Washington law. Unlike Washington, under California law the party challenging the agreement had the burden of proving the invalidity of the presumptively valid agreement. Cal. Fam. Code § 1615(a); *Marriage of Bonds*, 5 P.3d at 831. It also was arguably easier to prove invalidity under the 1986 California law than under current Washington law.

Accordingly, the questions this court raised concerning the choice of law governing the formation of the prenuptial agreement are for naught. The parties did not rely on the former California law and have no interest in attempting to prove their case under those standards. The trial judge was not required sua sponte to raise the issue, even if would have been permissible. The trial court properly applied Washington law in these circumstances.

*Burden of Proof*

Mr. Yamada's first contention is an argument that the trial court was required to state the "clear, cogent, and convincing" standard in its written findings. Since he has no authority in support of that proposition, we find no error.

This court reviews the application of a court rule to a particular set of facts de novo. *Pulich v. Dame*, 99 Wn. App. 558, 561, 991 P.2d 712 (2000). CR 52(a)(1) states: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law."

It is the general rule that findings of fact need not be made concerning every contention made by the parties to a case. *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 707, 592 P.2d 631 (1979). Findings must be made as to all of the "material issues." *Id.* (quoting *Bowman v. Webster*, 42 Wn.2d 129, 134, 253 P.2d 934 (1953)). The trial court need not make negative findings but it must inform the reviewing court what material issues it decided and the basis for its decision. *Id.* The absence of a finding on a material issue is presumptively a negative finding entered against the party with the burden of proof. *Pilling v. E. & Pac. Enters. Trust*, 41 Wn. App. 158, 165, 702 P.2d 1232 (1985). Amending or reversing of an oral ruling that has not been reduced to writing is outside the scope of CR 52. *Hubbard v. Scroggin*, 68 Wn. App. 883, 888, 846 P.2d 580 (1993).

Here, the burden of proof was not a material fact that the court was required to include in the written findings. *Daughtry*, 91 Wn.2d at 707. Moreover, the court did

8

notify the parties in its oral ruling that the burden was clear, cogent, and convincing. Even if it were required to state the quantum of burden in its written findings, such an omission would be outside the scope of CR 52. *Hubbard*, 68 Wn. App. at 888.

The burden of proof is not a factual question that needed to be included among the findings required by CR 52. Although it may present an issue of law, it is not necessarily a conclusion of law that must be stated in the written ruling required by CR 52. Appellant has not established that there was any necessity of reducing that statement to writing.

The written findings were not defective for failing to state the burden of proof, something that was not a contested issue at trial.

*Validity of the Prenuptial Agreement*

Mr. Yamada also challenges the trial court's determination that his one-sided agreement with Ms. Herr was valid. We concur in the trial judge's assessment of the amateur nature of this agreement and we, too, conclude that it was valid. As the sole challenge to the property division is based on the theory that the agreement was invalid, we have to also affirm the distribution.

Washington adjudges challenges to prenuptial agreements under its well-developed common law rather than by statute. Prenuptial agreements are subject to the principles of contract law. *In re Marriage of DewBerry*, 115 Wn. App. 351, 364, 62 P.3d

9

525 (2003). Washington's public policy favors prenuptial agreements.[7] *Id.* "If fair and fairly made, we have held prenuptial agreements between competent parties to be valid and binding." *In re Marriage of Matson*, 107 Wn.2d 479, 482, 730 P.2d 668 (1986). The agreements must be both substantively and procedurally fair. In assessing the validity of such agreements, our courts first look at substantive fairness by checking whether the agreement "provides a fair and reasonable provision for the party not seeking enforcement of the agreement." *Id.* If so, "the analysis ends and the agreement may be validated." *Id.* If not, the courts must look to questions of procedural fairness. Did the parties have full knowledge concerning the amount and value of the property involved? Was the agreement entered into fully and voluntarily with full knowledge of their own rights? *Id.* at 483. Review of these latter questions includes looking at the circumstances involved in the execution of the agreement. *Id.* at 484. It is the facts at the inception of the agreement that are critical; the results of an agreement do not bear on the question of fairness at inception. One important factor in procedural fairness is whether both parties had the opportunity for representation by counsel. *In re Marriage of Foran*, 67 Wn. App. 242, 256, 834 P.2d 1081 (1992).

---

[7] "There is nothing unfair about two well-educated working professionals agreeing to preserve the fruits of their labor for their individual benefit." *DewBerry*, 115 Wn. App. at 365.

We review the trial court's conclusion on substantive fairness de novo, as with any question of law. *Id.* at 251. The construction of a contract is a question of law. *Id.* at 249 (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801 P.2d 222 (1990)). The trial court's resolution of the second prong of the *Matson* analysis is a mixed question of law and fact that is reviewed de novo with consideration for the trial court's resolution of the factual matters. *In re Marriage of Bernard*, 165 Wn.2d 895, 903, 204 P.3d 907 (2009).

Our case law over the years has distilled several "rules" from certain fact patterns. An agreement disproportionate to the respective means of each spouse, which also limits the accumulation of one spouse's separate property while precluding any claim to the other spouse's separate property, is substantively unfair. *Id.* at 905. Other fact patterns suggest the need for close scrutiny. For instance, when an agreement attempts to totally eliminate community property rights, the court must zealously and scrupulously examine it for fairness. *Matson*, 107 Wn.2d at 486. A prenuptial agreement that contains no provision for one spouse also must be scrutinized carefully. *Estate of Crawford*, 107 Wn.2d 493, 498, 730 P.2d 675 (1986).

With these principles in mind, it is time to turn to Mr. Yamada's arguments. He contends that the agreement was the product of overreaching by Ms. Herr, as evidenced by the fact that he was not represented by counsel and the community ended up with little in the way of assets. While that first fact goes to the issue of procedural fairness, the second is of no consequence to the determination of the validity of this agreement when it

11

was adopted. Neither of these two points weigh in on the threshold question of whether it was substantively fair.

The trial court held that the agreement was substantively fair despite the fact that it was one-sided in favor of the person who sought to enforce the agreement. CP at 11-12. The trial court expressly found that at the time the agreement was executed, Mr. Yamada was a business executive with an extensive income and personal business interests, while Ms. Herr was a secretary with modest income and modest assets. *Id.* Mr. Yamada also was expecting to receive, as his personal property, some of the proceeds from the sale of his then-marital community's house.

Thus, this case presents the question of whether an agreement that favors one party is substantively unfair when it favors the party in the weaker economic position.[8] We conclude that an agreement that favors the economically weaker party is not necessarily substantively unfair. The entire circumstances of the agreement still must be considered.

The agreement altered the legal status quo in two respects: (1) it treated Ms. Herr's earnings as her separate property rather than as community property, and (2) it waived Mr. Yamada's interest in her separate property, including by inheritance. It did not address (and thereby could not alter) Mr. Yamada's separate property. It did not change

---

[8] It appears that the trial court reached its result for that very reason. The court's findings suggest that it believed the agreement was procedurally unfair, but that substantively it was not unfair given the differing economic circumstances of the parties. CP at 11-12.

the rights of the parties to inherit or manage the community property. It did not eliminate or prohibit community property, nor did the agreement alter any obligations of the community. In short, the agreement simply allowed Ms. Herr to retain her earnings (and its proceeds) as her own property without claim from Mr. Yamada and obligated him, while the marriage lasted, to support her. He was free to end that obligation by ending the marriage.

This arrangement was understandable for a middle-aged couple with children from their previous marriages. Each could understandably desire to manage their own property with the idea of passing it along to the children rather than the new spouse. While the agreement could have been more mutual, with, for instance, Mr. Yamada's right to build separate property from community funds recognized, it did not have to be.

This agreement was not so one-sided to be substantively unfair as in *Matson* or *Bernard*. With the benefit of hindsight, it is clear that Ms. Herr came out of this better financially than Mr. Yamada did. However, that result occurred because of his choice to maintain the marriage even after she moved to Washington and to support her at the level that he did while the couple was living apart. He was not required to support her separate lifestyle, although he chose to do so.

The fairness of an arrangement is adjudged by the circumstances existing at the time of the agreement. This arrangement, while favorable to Ms. Herr, largely just maintained her in the same circumstances as existed when the agreement was drawn up.

13

No. 34227-1-III
*In re the Marriage of Herr v. Yamada*

To marry her, Mr. Yamada had to support her and allow her to keep her own earnings.

He chose to do so. Under these facts, the agreement was not substantively unfair.

The judgment is affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Korsmo, J.

I CONCUR:

_____
Fearing, C.J.

No. 34227-1-III

PENNELL, J. (dissenting) — I agree we should apply Washington law to this case and that the trial judge need not explicitly identify the applicable burden of proof in written findings. I would nevertheless reverse and remand this matter as the trial court did not sufficiently identify whether the prenuptial agreement was: (1) substantively fair, or (2) substantively unfair but nevertheless procedurally valid.

*Governing legal principles*

When addressing a contested prenuptial agreement, there first must be a determination as to whether or not the agreement is substantively fair. This is a limited inquiry. Reviewed largely de novo, it simply involves looking at the plain terms of the agreement and assessing whether it disproportionately disadvantages the spouse with fewer financial resources. *In re Marriage of Bernard*, 165 Wn.2d 895, 902-03, 905, 204 P.3d 907 (2009). The proponent of the agreement must prove any issues of fact regarding this inquiry through clear and convincing evidence. *Kolmorgan v. Schaller*, 51 Wn.2d 94, 98, 316 P.2d 111 (1957). If an agreement meets the substantive fairness test, it must be enforced without any further inquiry. *Bernard*, 165 Wn.2d at 902.

It is only when a prenuptial agreement is substantively *unfair* that courts go on to assess whether procedural fairness nevertheless warrants enforcement. In general, procedural fairness involves two questions: "(1) whether the spouses made a full disclosure of the amount, character, and value of the property involved and (2) whether

the agreement was freely entered into on independent advice from counsel with full knowledge by both spouses of their rights." *Id.* at 902-03.

Although advice of counsel is usually a necessary component of procedural fairness, it is not always required. *In re Marriage of Matson*, 107 Wn.2d 479, 483-84, 730 P.2d 668 (1986); *In re Marriage of Foran*, 67 Wn. App. 242, 256-57, 834 P.2d 1081 (1992). Procedural fairness turns on the totality of the circumstances, including "[t]he bargaining positions of the parties, sophistication of the parties, presence of independent advice, understanding of the legal consequences and rights, and timing of the agreement juxtaposed with the wedding date." *Matson*, 107 Wn.2d at 484. A substantively unfair prenuptial agreement will be enforced, even against an unrepresented party, if the facts demonstrated the unrepresented party had a "*full understanding of the legal consequences of the contract.*" *Foran*, 67 Wn. App. at 257.

If the totality of the circumstances indicate the prenuptial agreement was reached in a procedurally fair manner, it will be given effect even if its terms are substantively unfair. *Bernard*, 165 Wn.2d at 902-03.

*The trial court's analysis—substantive fairness*

In reviewing the parties' agreement, the trial court began by touching on the subject of substantive fairness. The trial court recognized the agreement was so one-sided that "[n]o competent attorney would counsel a client to sign" it. Clerk's Papers at 10. Indeed, the agreement required that Shizuo Yamada give financial support to

2

Priscilla Herr, but did not impose a reciprocal obligation unless Mr. Yamada were to become incapacitated. It also provided that Ms. Herr's contribution to community property shall be deemed her separate property, but Mr. Yamada's contributions would remain community property. As noted by Mr. Yamada's appellate counsel, the agreement essentially declared that "what's hers is hers, and what's his is theirs." Appellant's Opening Br. at 17.

Because the agreement is indisputably one-sided, its substantive fairness turns on whether or not it provided a reasonable accommodation for the parties, in light of their respective incomes and financial resources at the time of execution. This is a factual inquiry and deference to the trial court is warranted. However, the trial court never made any formal findings about the parties' incomes. Instead, the court inferred Mr. Yamada's income must have been significantly higher than Ms. Herr's given the nature of the couple's occupations. Such an inference is insufficient to sustain a finding of substantive fairness, particularly in light of Ms. Herr's burden to prove her case by clear and convincing evidence.

Given the prenuptial agreement's unequal property allocations and the lack of clear facts or findings regarding the parties' relative incomes, the trial court's enforcement determination cannot be sustained on the basis of substantive fairness.

3

## *The trial court's analysis—procedural fairness*

Because the record was inadequate to prove substantive fairness, it was appropriate for the court to consider the issue of procedural fairness. However, as noted above, the court should not have treated Mr. Yamada's lack of legal representation as dispositive. Instead, the trial court should have considered the totality of the circumstances.

Many of the fairness issues discussed by the trial court (and in the majority opinion) are relevant to the broad subject of procedural fairness, not substantive fairness. Mr. Yamada's sophistication, his desire to secure Ms. Herr's companionship, and his belief that the agreement was a good deal all go to the issue of procedural fairness. *Matson*, 107 Wn.2d at 484-85. These circumstances do tend to suggest Mr. Yamada signed the prenuptial agreement with eyes fully open. Thus, while the agreement was one-sided—and perhaps impermissibly so—there are facts suggesting Mr. Yamada was fully aware of the nature of the document and signed it because he prioritized his relationship with Ms. Herr over his financial interests.

While there are numerous facts suggesting the prenuptial agreement was procedurally fair, this was not the trial court's ruling. The trial court appears to have rejected procedural fairness based entirely on Mr. Yamada's lack of legal representation. I would remand this matter to the trial court for reconsideration of procedural fairness under the correct legal standard.

4

No. 34227-1-III
*In re Marriage of Herr v. Yamada* (dissent)

## CONCLUSION

The record indicates that the trial court could have found the parties' agreement enforceable under the governing legal standard. However, this is not clear. Given the fact intensive nature of the inquiry, I would remand this matter for revised findings, and perhaps further proceedings, under the applicable legal framework.

_____

Pennell, J.

5