IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | |
| | ) | No.  38609-1-III |
| DANIEL COOPER, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| RENU SINHA, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — In this marital dissolution proceeding, the dissolution court upheld the validity of the parties' prenuptial agreement, but then distributed assets in conflict with terms of the agreement.  On appeal by the wife, Renu Sinha, we remand to the dissolution court to allocate the parties' property in conformance with the agreement. We affirm the superior court's award of maintenance to the husband, Daniel Cooper, but remand to reassess the amount.

FACTS

Daniel Cooper and Renu Sinha met, in the late 1980s, when Cooper worked as a chef at a Hindu temple in Columbus, Ohio.  Dr. Sinha then attended Ohio State University Medical School, where she graduated in 1989.

Dr. Renu Sinha took residency at the University of California, Davis. Daniel Cooper separately relocated to California, where he worked as a check sorting machine operator for a bank and for an electronic retailer. In 1991, Sinha returned to Ohio for a fellowship in Surgical Critical Care at Ohio State University.

Between 1990 and 1995, Daniel Cooper telephoned Renu Sinha intermittently. Cooper professed romantic feelings for Sinha on Valentine's Day 1994. Cooper was then married and had one earlier divorce. He obtained a divorce from his second wife in January 1995. Sinha did not learn of these previous marriages until 2016. In spring 1995, Cooper relocated to Ohio to be with Sinha. The two resided in Sinha's Columbus condominium.

Renu Sinha moved to Tucson, Arizona in July 1995 and began a surgical practice. She bought a home in Tucson with savings and funds deposited in her name, at age thirteen, into a Uniform Gift to Minors account by her parents. We do not know the sum of the account or the purchase price of the home.

Renu Sinha rented her condominium located in Columbus. Sinha deposited the rents from the condominium in a joint account with Daniel Cooper, from which account she paid the mortgage on the condominium and the Tucson residence. Daniel Cooper found employment in Arizona as a gem salesperson for a jeweler.

The parties differ as to when the two agreed to marry. Daniel Cooper testified the two became engaged before they located to Arizona. Renu Sinha averred the two became

2

betrothed in February 1996 after the move to Arizona. The dissolution court found the couple became engaged after the move.

The dissolution court also found that, after the engagement but before the marriage, Daniel Cooper mentioned to Renu Sinha that he may later inherit property in Lake Tahoe, Point Loma, and Le Mesa, California. Cooper disclosed a wish to protect the two's assets from a medical malpractice action. During trial testimony, Cooper denied being the person who first mentioned sheltering assets and denied anticipating an inheritance. The district court rejected this testimony of Cooper.

The trial court found that Daniel Cooper engaged Arizona attorney Richard Duffield to shelter the betrothed couple's assets from uninvited taxes and unwanted lawsuits. Between February and May 1996, the duo periodically met with attorney Duffield, with Cooper sometimes visiting Duffield on Cooper's own. Three written phone messages confirm Cooper initiated calls to Duffield. Duffield planned for each spouse to establish separate trusts and for both to sign pour-over wills and a prenuptial agreement. A pour-over will transfers an individual's remaining assets to a previously established trust upon his or her death.

In a March 29, 1996, Richard Duffield sent a letter to both Daniel Cooper and Renu Sinha at their mutual Tucson address. The letter described a prospective prenuptial agreement as part of a plan "wherein you agree that the community earnings of either

3

party shall be that party's separate property." Exhibit (Ex.) R-501 at 5. Duffield also

explained the overall purpose of legal instruments he intended to prepare:

> A few additional comments may be helpful. You will note that each of you will have two revocable trusts. Into the first one you will place the property which you own now, and you may also place into it any property you receive by gift or devise from anyone other than each other. We can be assured that that property will not be subject to the claims of creditors of the other spouse.
>
> Into the second trust you will place your own earnings and such of those as are transferred from the other of you as your separate property. In all probability, the property in this trust should also be insulated from creditors of the other spouse. However, we do have to recognize that creditors of the other spouse and, in particular, creditors of the community, may seek to recover their claims from property in this trust on the ground that the prenuptial agreement and transfers from the debtor spouse to the other spouse are simply a device to avoid the claims of creditors of the community. If transfers between spouses are only made at a time when there are no identified existing or potential creditors of the spouse making the transfers, we should be able to successfully resist the claims of the creditors of the debtor spouse to property in the trust of the other spouse.

Ex. R-501 at 5. At trial, Cooper denied receiving this letter.

In an undated joint letter prepared by Daniel Cooper and sent to attorney Richard

Duffield, the parties listed their assets and value of assets:

> Dan Cooper (assets) –
>
> 1993 Ford Ranger ..................................... $10,000.00
> Fidelity investments .................................... $4,000.00
> Fidelity IRA. ...............................................$3,000.00
> Personals jewelry, computer etc ................. $8,000.00
> Life Insurance ...........................................$30,000.00
> Bank checking avg balance .......................... $5,000.00
> (joint checking with Renu Sinha)

> Renu Sinha (assets) –
> 1995 Toyota Camry .................................... $28,000.00
> Real Estate Tucson ................................ $215,000.00
> Real Estate Ohio (rental) ............................ $65,000.00
> Total Fidelity investments
> including IRA ...............................................$28,000.00
> Umbrella Insurance policies
> for both properties .................................. $1,000,000.00
> Life Insurance/ Disabled ....................... $2,000,000.00
> Personal property ........................................ $30,000.00

Ex. R-501.

On May 22, 1996, attorney Richard Duffield sent another letter to the couple,

which letter included drafts of legal documents:

> I have now prepared two Revocable Trusts for each of you. The ones for Renu are called THE RENU SINHA SEPARATE PROPERTY REVOCABLE TRUST and THE RENU SINHA DOMESTIC SEPARATE PROPERTY REVOCABLE TRUST. The ones for Dan are called THE DAN COOPER SEPARATE PROPERTY REVOCABLE TRUST and THE DAN COOPER DOMESTIC SEPARATE PROPERTY REVOCABLE TRUST. They are identical for each of you.
> Let me reiterate the reason for the two Trusts. We wish to segregate your separate property which you presently own or may acquire by gift or devise during your marriage from that separate property which will arise as a result of any division of community property by agreement between the two of you. We want to make sure that any claim creditors of the community might make against the second trust ("Domestic Separate Property Revocable Trust") will not affect the property in the first Trust.
> The provisions of the two Trusts are essentially identical. There are essentially three stages of each Trust:
> (1) During your lifetime;
> (2) During the lifetime of the survivor of the two of you;
> (3) Upon the death of the survivor of the two of you.
> During your lifetimes, each of you has all of the same control and authority over the property in the Trusts as though it were still in your own names. You are entitled to all of the income. You may withdraw all or any

portion of the principal.  You may amend and revoke the Trust.  You have full control over the investment and reinvestment of the property.

. . . .

The pourover Wills do two things.  They dispose of your tangible personal property. And they provide any property you have not placed into your Trust during your lifetimes will pour over into your Trusts.  A distinction is made between that property going into the Separate Property Revocable Trust and the Domestic Separate Property Revocable Trust.

The Prenuptial Agreement basically does two things.  It provides that the separate property which you have going into the marriage will continue to be your separate property.  Of equal importance are the provisions of paragraph 5.  They provide that any community property of the parties shall be the separate property of the party producing it.  This provision will enable you to gift to one another community property and thereby transmute it into separate property.  Any property so gifted and transmuted would be put into the Domestic Separate Property Revocable Trust, because it might be the subject of an attack by creditors of the community.

Please review the documents and let me know if you have any questions.  In particular, I will need to have your instructions with respect to the disposition of your property upon the death of the survivor of you for which a blank is left in paragraph F (3) on page 6.

I shall wait to hear from you.

Ex. R-501 at 7-9.  At trial, Daniel Cooper denied reviewing this letter or the enclosed documents.

On May 30, 1996, Renu Sinha signed the prenuptial agreement and the two trust agreements prepared for her.  Daniel Cooper met separately with attorney Richard Duffield the following day when he signed the prenuptial agreement and his two trust instruments.  At trial, despite the May 22 letter, Cooper denied any advance knowledge of Duffield preparing a prenuptial agreement.  He averred the prenuptial agreement must have been the idea of Sinha and that Duffield surprised him when presenting him the

antenuptial contract to sign on May 31.  During trial, Cooper conceded, however, that despite his misgivings, he signed the prenuptial agreement.

During trial, Daniel Cooper declared that he did not understand the prenuptial agreement when he signed it.  He then concluded, however, that he lacked any choice but to sign.  Cooper had already moved twice to be with Renu Sinha, and they were a week from their wedding ceremony.  The dissolution court determined this testimony to lack credibility.  In detailed initial finding of fact T, the court wrote:

> Petitioner and Respondent each reviewed the Prenuptial Agreement and the Revocable Trusts enough to accept that the documents were understood, had been drafted to accomplish their established goal(s) and to accept the legal impact of each document moving forward.

STATUS REPORT PER ORDER OF MAY 31, 2023, *In re Marriage of Cooper & Sinha*, No. 38609-1-III (Wash. Ct. App. Aug. 28, 2023).

The prenuptial agreement reads, in part:

> **THIS AGREEMENT** made this <u>30</u> day of May, 1996, by and between DANIEL COOPER and RENU SINHA of Tucson, Arizona.
> **WHEREAS,** the parties to this Agreement intend to be married in the near future and make this Agreement in consideration of such marriage; and
> **WHEREAS,** each of the parties own individual real and personal property, the nature and extent of the holdings of each party having been disclosed to each other; and
> **WHEREAS,** the parties desire and intend for each to retain his/her separate property and to avoid acquiring any interest in the separate property of the other; and
> **WHEREAS,** the parties are desirous of entering into this Prenuptial Agreement to define their respective rights as to both their community property and their separate property, as well as after-acquired property,

together with all income, profits, accretions, or additions and substitutions thereto.

**NOW, THEREFORE, IT IS AGREED AS FOLLOWS:**

1. This Agreement is entered into in consideration of marriage and its effectiveness is expressly conditioned on such marriage between the parties actually taking place.

2. That a full disclosure of the respective properties and debts have been made by the parties, each to the other, and each fully understands the holdings and debts of the other.

3. All the property of DANIEL COOPER existing at the time of such marriage, all increases thereof and all income, profits, and other benefits therefrom (whether or not resulting from his personal attention) shall be and shall forever remain the sole and separate property of DANIEL COOPER, and RENU SINHA waives and releases any right or interest therein which she, at any time might otherwise have.

4. All the property of RENU SINHA existing at the time of such marriage, all increases thereof and all income, profits, and other benefits therefrom (whether or not resulting from her personal attention) shall be and shall forever remain the sole and separate property of RENU SINHA, and DANIEL COOPER waives and releases any right or interest therein which he, at any time might otherwise have.

5. The earnings and other income (if any) of each party which would otherwise be community property of the parties, all increases thereof and all income, profits, and benefits therefrom shall nevertheless be and remain the separate property of such party.

6. Each party relinquishes, disclaims, releases, and forever gives up any and all right, claim, or interest in or to the property of the other including but without being limited to community property rights, dower interests, rights as an heir or surviving spouse, rights of family allowance or homestead exemption, election to take against the Will of the other and a share in the real or personal property in the estate of the other, and agrees to hold the other party or the other party's estate harmless of any claim made by reason of any such rights.

7. That the separate property of each of the parties hereto and the income therefrom shall not be commingled with the other's property or funds and shall remain the separate property and income of each party. However, the parties may agree to establish joint bank accounts, in which event all sums deposited thereto shall become the joint or

8

community property of the parties.

8. That any property held by the parties as community property, joint tenants with rights of survivorship, or as tenants in common shall be equally divided between the parties in the event their contemplated marriage shall be terminated by divorce, legal separation, or annulment.

. . . .

12. This Agreement shall be governed by the laws of the State of Arizona.

Clerk's Papers (CP) at 72-74; Ex. R-501 at 25-28.

The couple wed on June 7, 1996 in Arizona.

After signing the documents prepared by Richard Duffield, Renu Sinha and Daniel Cooper received a copy of the fully executed documents, including the prenuptial agreement. In the letter accompanying the documents, Duffield enclosed a checklist of procedures, including funding the trusts by transferring any real property, securities, and accounts, other than personal or household checking accounts, into their respective trusts. Duffield also recommended that the parties respectively name their Separate Property Revocable Trusts the beneficiaries of any life insurance policies.

As recommended by attorney Richard Duffield, the couple funded their individual Separate Property Revocable Trusts with each of their premarital Fidelity Investment accounts identified in the initial letter to Duffield. Renu Sinha also named her Separate Property Revocable Trust the beneficiary of her premarital life insurance policy. Duffield prepared a deed transferring the Tucson house, purchased before marriage, into Sinha's Separate Property Revocable Trust. The attorney recommended that Sinha

9

contact a lawyer in Ohio to prepare a deed to transfer the condominium into the trust. At trial, Sinha presented no deed to the trust for the Columbus condominium. No documentation confirmed whether the parties took action to fund their Domestic Separate Property Revocable Trusts, which intended to combine any assets acquired during the marriage with their separate property earnings.

At the outset of marriage, each spouse maintained a Fidelity IRA account and a Fidelity Investment account. During the marriage, Daniel Cooper opened and maintained five financial accounts, to which Renu Sinha lacked access: Fidelity Simple IRA *5053; E-Trade Account *6788; Chase Checking *2120; Chase Savings *1379; and Bangkok *0592. By the time of trial, Cooper had nearly depleted the Chase Checking and Savings Accounts *2120 and *1379. Cooper employed the Bangkok *0592 account solely for Gemcuts, International business, which business we discuss in paragraphs to come.

In January 1998, Renu Sinha and Daniel Cooper begot a daughter. Cooper served as the primary caregiver for the child. The daughter graduated from college during the pendency of this marital dissolution action.

On September 17, 1998, Daniel Cooper and Renu Sinha signed amendments to each of the revocable trusts that added the daughter as a beneficiary. Attorney Richard Duffield prepared the amendments.

10

After the daughter's birth, Daniel Cooper ceased work as a sales clerk for Silverman's Factory Jewelers to stay home and care for her. At that time, Cooper earned $25,702 a year.

Daniel Cooper maintained a hobby of rock hounding, which turned to a business pursuit. During the marriage, he obtained a gemology degree and started an online business, Daniel Scott Company. Attorney Richard Duffield advised Cooper to incorporate the gem business to maintain its separate property character in conformance with the couple's prenuptial agreement. With the assistance of Duffield, Cooper incorporated Gemcuts International (Gemcuts) in 1999. Through Gemcuts, Cooper purchased gems wholesale and sold them at trade shows, online, and to local jewelers.

In 2001, Renu Sinha and Daniel Cooper moved to Spokane, where Dr. Sinha worked as a surgeon at Deaconess Medical Center. Sinha deposited the proceeds from the sale of the Tucson house, held in her Separate Property Revocable Trust, into a joint account, from which the couple purchased a Spokane residence titled in both spouse's names.

Renu Sinha became a partner in Inland Surgical Associates in 2002 and began work for Rockwood Clinic in 2007. Between 2012 and 2015, Sinha earned an average annual income of over $250,000. As a result of her employment during the marriage, Sinha amassed over $1.1 million in retirement accounts, in addition to the nearly

11

$137,000 retained from her premarital retirement account. On top of the premarriage IRA, Cooper also accumulated during the marriage an IRA worth $78,712.

Renu Sinha and Daniel Cooper maintained joint accounts, in which they deposited their respective earnings, and paid joint and individual expenses from these accounts. Cooper sometimes paid Gemcuts International's business expenses from the joint accounts.

In November 2015, Renu Sinha contracted granulomatosis with polyangiitis, an autoimmune disease that effects the vascular system, lungs, kidneys, nerves, muscles, and bone structure. The disease caused extreme, unabating fatigue, shortness of breath, and a 103-degree fever that would not respond to medication. Despite tests and blood work, physicians could not at first diagnose the disease. Sinha was hospitalized for six weeks and spent a week on a ventilator. Doctors gave her a 5 percent chance of living more than two years. As her condition worsened, Sinha told Daniel Cooper that he needed to ensure that his business could pay for his retirement. After thoughtful treatment, Sinha beat her odds of imminent death and now enjoys a good chance of a normal life expectancy if she continues her extraordinary treatment that includes chemotherapy infusions, antibiotics, high dose steroids, vitamins, osteoporosis medication, and an aggressive ayurvedic regimen. Ayurbedic is an alternative medical regime originating in the Indian subcontinent. The treatment includes herbs, yoga, meditation, and strict nutrition.

12

On release from intensive care, Renu Sinha opened a separate bank account, wherein she deposited her disability benefits. Sinha occasionally transferred money from this separate account to a joint account for purposes of paying family expenses.

Daniel Cooper kept unreliable business records for Gemcuts International. The business had little or no reported income from 2005 onward. The tax returns of Gemcuts International showed 2012 net income as $3,345. Gemcuts lost $3,024 in 2013. The business earned $3,895 in 2014, earned $11,219 in 2015, lost $14,945 in 2016, and lost $3,940 in 2017.

In 2017, while on a business trip to Thailand, Daniel Cooper suffered an exacerbation of a medical condition that led to a brief hospitalization. According to Cooper, he encounters tremors in his right hand and lower arm, osteoarthritis in his knee, and osteopenia in his back. At trial, he also averred that he suffers from bipolar disorder, anxiety, social anxiety, and depression. He has a history of binge drinking and self-medicating with alcohol, but, at trial, denied imbibing alcohol in the last year. He suffers memory relapses.

The parties separated in July 2017. Daniel Cooper then moved from the family Spokane home and into a condominium the parties purchased in Idaho.

In December 2018, expert Kenneth Burchell inventoried gems, gem equipment, and jewelry in the parties' home safe and safe deposit boxes. His inventory logged

13

photographs and descriptions of 320 pieces of jewelry, gems, and gem lots. The list also catalogued 64 items of gem tools and equipment.

Renu Sinha's expert Brock Pounder appraised all objects in Kenneth Burchell's inventory at a total retail value of $318,456.66. Pounder added sums in Gemcuts International's financial accounts to arrive at a value for the business at $498,000.

Each spouse hired an expert to appraise the value of the company. Renu Sinha's expert, CPA Todd Carlson, employed two valuation methods, the asset approach and the earnings approach, to value Gemcuts International as a business. When ascertaining earnings, Carlson noticed that the tax returns and the bank statements showed inconsistent amounts of income. When reviewing bank statements, Carlson could not always determine whether many withdrawals defrayed a business expense or defrayed a personal expense. According to Carlson, because of the inconsistent information on income, he could not opine that Gemcuts probably generated net income, only that the business possibly garnered some profit.

Todd Carlson testified that Gemcuts International's assets included bank accounts, gem inventory, and equipment. He then compared the earnings valuation with the asset evaluation to arrive at a final valuation for the business. Of those two approaches, Carlson weighted the asset approach as being 75 percent more accurate of the two approaches. This asset-based approach produced a value of $491,709, about $6,000 less than the earnings evaluation. Carlson borrowed Brock Pounder's inventory appraisal to

set the value of the gems at $291,035. Based on Carlson's testimony, Renu Sinha asked the court to value Gemcuts International at $498,000.

Daniel Cooper's expert witness, CPA Paul Fruci, agreed that the asset, or liquidation, approach led to the more accurate valuation of Gemcuts International. Fruci noticed that the tax returns showed little profits and the most recent return for 2019 showed no profit. The company did not earn enough income to support a salary for a manager, a factor in discounting the use of earnings in order appraise a business. Thus, the proper approach to appraising Gemcuts was simply to add the value of the gems and the amount in bank accounts. Fruci relied on the bank balances and gem inventory value created by Todd Carlson.

Todd Carlson used the bank balances in Gemcuts International's accounts as of the end of 2016, six months before the parties' formal separation but after the two lived separately. The balances then equaled $200,674. In 2017, the account balances dropped to 76,485 without any reasonable explanation. Paul Fruci, when valuing the assets of Gemcuts, used an approximate difference of the two figures of $130,000 based on a sense of fairness, although he conceded the trial court would need to determine the date of valuation. Fruci had no explanation as to the drop in account balances between December 2016 and June 2017. According to Carlson, one would have expected the inventory and equipment of the business to increase as a result of this decrease in cash on hand, but Carlson found no corresponding increase in inventory and equipment.

15

Later during trial, Daniel Cooper testified that, at the beginning of 2017, he paid personal expenses from the Gemcuts International bank accounts. Cooper explained the drop in bank account balances resulted from the payment of these personal expenses.

Daniel Cooper also testified that he did not keep any Gemcuts International jewels at home. He asserted that all jewelry listed in Kenneth Burchell's 2018 inventory and found in the parties' home safe and safe deposit boxes was his personal inventory, not Gemcuts International's inventory. He added that he sold all remaining business inventory of Gemcuts for $12,000 in 2017, after the parties separated. Cooper, however, previously avowed in a sworn declaration that he kept business inventory at home. At trial, Cooper appraised his gems and jewelry at $33,311 and the gem equipment at $5,005.

Daniel Cooper's former psychologist, Dr. Henry Montgomery, testified that, when he treated Cooper in 2019, he questioned Cooper's ability to work because his disorders gravely impacted his ability to utilize his executive functions. The disorders interfered with Cooper's ability to focus on information, to reason, and to exercise judgment. Dr. Montgomery believed Cooper could qualify for Social Security disability benefits. Cooper applied for Social Security benefits, but the government denied coverage. According to Cooper, he had not sufficiently paid into the Social Security system to receive benefits.

Ruth Johnson, a vocational rehabilitation counselor, testified that Daniel Cooper's physical ailments and poor mental health rendered him unemployable. Dr. Debra Brown, who conducted a psychological evaluation of Cooper, also opined at trial that Cooper could not work due to his significant psychiatric deficits and bipolar disorder.

At the request of Renu Sinha, Dr. Ron Klein, a psychologist, examined and tested Daniel Cooper. Dr. Klein concluded that Cooper could be gainfully employed. Dr. Klein testified that Cooper manipulated the test results of an MMPI evaluation.

At the time of trial, Renu Sinha was 56 years of age. Because of her immunity disorder, Sinha cannot work. She accrues income of $20,000 a month from social security disability and disability insurance payments. Disability insurance payments will end in June 2031.

## PROCEDURE

Daniel Cooper filed a petition for dissolution on February 13, 2018. The dissolution court conducted a trial in March 2021.

At trial, Renu Sinha asked the dissolution court to enforce the prenuptial agreement. The parties' net total marital estate was then worth over $2.2 million. Sinha claimed $1.6 million of the marital estate as her separate property.

In an oral ruling, the dissolution court found:

> It was acknowledged that Mr. Cooper sought out Mr. Duffield, . . . who drafted this document [the prenuptial agreement]. The parties each had an opportunity to review it, and they each agreed to sign it in Arizona.

17

Report of Proceedings (RP) at 2128.  The court entered the additional finding:

> T.  Petitioner [Daniel Cooper] and Respondent [Renu Sinha] each
> reviewed the Prenuptial Agreement and the Revocable Trusts enough to
> accept the documents were understood, had been drafted to accomplish
> their stated goal(s) and to accept the legal impact of each document moving
> forward.

STATUS REPORT PER ORDER OF MAY 31, 2023, *In re Marriage of Cooper &*

*Sinha*, No. 38609-1-III (Wash. Ct. App. Aug. 28, 2023).  The court adjudged the

prenuptial agreement to be valid.  The dissolution court entered a written finding of fact:

> The spouses signed a prenuptial agreement on May 30, 1996.  The
> agreement is valid.

CP at 764.  The court recognized the Arizona choice of law provision in the agreement,

but decided to apply Washington law because of the length of time the couple resided in

Washington State.

At trial, Daniel Cooper argued that the dissolution court should not enforce the

prenuptial agreement because the parties failed to follow the contract.  In its oral ruling,

the court first commented that "neither side really contended that they paid much

attention to incomes or the prenuptial agreement."  RP at 2128.  Nevertheless, the court

also disagreed with Cooper's contention and found that the couple "continued to follow it

[the agreement] to the extent that they understood it."  RP at 2141-42.  The court

underscored that the parties amended the trust documents that were companion to the

prenuptial agreement.  In 1999, Cooper followed attorney Richard Duffield's advice to

incorporate his gem business to maintain its separate property character in fulfillment of the parties' prenuptial agreement.

The court ruled each residence to be community property, in compliance with the prenuptial agreement. Renu Sinha argued that she was entitled to her separate property contribution to the primary home because the contribution came from the sale proceeds from her premarital separate property home. The dissolution court recognized this separate property contribution, but it declared the home community property anyway because of use of money from joint accounts to pay the mortgage.

In a joint trial management report, the parties agreed to a division of the 320 pieces of jewelry. The report also assigned all gem equipment to Daniel Cooper. The report agreed to a $26,256.09 value for Renu Sinha's jewelry and $294,215.56 for Cooper's jewelry and equipment. The dissolution court adopted the management report's division of jewelry and equipment and the values assigned in the report.

The dissolution court expressed difficulty in appraising the value of Gemcuts, International because of poor recordkeeping and the unreliability of self-reported business income. The court questioned whether Daniel Cooper could sell Gemcuts as an ongoing business. The court valued Gemcuts International at $100,000. But, if one accepts the valuation of $318,456.66 by expert Brock Pounder for all jewelry and equipment, Gemcuts International owned property worth $296,050.66. The court characterized the gem business as Cooper's separate property.

Despite declaring the prenuptial agreement valid, the dissolution court did not base its property division on the terms of the contract. The court instead impliedly referenced the Washington marital dissolution statute that directs the court to distribute assets fairly and equitably in light of all of the circumstances. In turn, because of the long-term nature of the marriage, the court placed the parties in an equal financial position. The court included Renu Sinha's separate property retirement accounts in the equal division.

After characterizing discrete items of property as separate or community property, the dissolution court divided the community property, awarded each spouse their separate property, and ordered a total equalizing payment of $625,430 from Renu Sinha to Daniel Cooper. The findings of fact, conclusions of law, and divorce decree do not total the value of property awarded to the respective spouses. In its oral ruling, the dissolution court commented that the total value of the couple's assets was $2,896,668. After deducting debt owed, the total marital estate was $2,655,060. The oral ruling did not identify the value of the assets assigned to each spouse and how the court arrived at a $625,430 equalization payment.

When allocating property, the dissolution court awarded Daniel Cooper the Gemcuts International business and its financial accounts. The court also awarded Cooper $294,215.56 in gems and equipment. The court did not resolve the parties' dispute as to whether the gems deemed Cooper's separate property belonged inside or outside Gemcuts International.

20

The dissolution court ordered Renu Sinha to immediately pay $40,084.50 in cash to Daniel Cooper. The court directed Sinha to pay the remaining balance of $585,345.50 in periodic payments from her retirement accounts.

The trial court found no disability prevented Daniel Cooper from employment. The dissolution court awarded Cooper maintenance of $3,000 monthly until Renu Sinha reaches age 65, at which time maintenance will fall to $2,000 per month.

## LAW AND ANALYSIS

On appeal, Renu Sinha primarily contests the court's award of property and spousal maintenance on the basis that the awards contradict the prenuptial agreement that the court adjudged binding. She insists that the agreement prevents Daniel Cooper from receiving any spousal maintenance. Sinha also challenges the dissolution court's characterization of some financial accounts as separate property of Cooper rather than community property. Finally, Sinha challenges the court's valuation of Gemcuts International at $100,000 as unreasonably low.

Daniel Cooper seeks to uphold the dissolution court's property division and award of spousal maintenance. In seeking to uphold both, Cooper cross-appeals the dissolution court's ruling affirming the validity of the prenuptial agreement. He also contends that, even if this court upholds the contract's legality, the terms of the agreement do not preclude the property division and spousal maintenance awarded by the court.

21

A dissolution court possesses considerable discretion in dividing property, and we will reverse only if a manifest abuse of discretion exists. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005); *In re Marriage of Tulleners*, 11 Wn. App. 2d 358, 369, 453 P.3d 996 (2019). The dissolution court also holds wide discretion when awarding maintenance. *In re Marriage of Condie*, 15 Wn. App. 2d 449, 470, 475 P.3d 993 (2020). A trial court abuses its discretion when a ruling is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997); *In re Marriage of Tulleners*, 11 Wn. App. 2d 358, 369 (2019).

A discretionary decision rests on untenable grounds or untenable reasons if the trial court relies on unsupported facts or applies the wrong legal standard. *Mayer v. Sto Industries, Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006). The court's decision is manifestly unreasonable if the court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person would take. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

PRENUPTIAL AGREEMENT ENFORCEMENT

We first address the enforceability of the antenuptial agreement because this ruling impacts other questions we face.

The prenuptial agreement signed by Renu Sinha and Daniel Cooper reads that Arizona law controlled the agreement. We do not know if either party cited Arizona law

to the dissolution court. The dissolution court applied Washington law when dividing the couple's property, but it did not expressly adopt Washington law when resolving the validity of the agreement. The parties on appeal assume that the court employed Washington law when upholding the prenuptial agreement.

On appeal, Daniel Cooper challenges the enforceability of antenuptial agreement. In doing so, he does not contend the dissolution court erred when applying Washington law.

In her opening brief, Renu Sinha did not assign error to the trial court's application of Washington law rather than Arizona law. In her reply brief, she asks that, if this court rules the prenuptial agreement to be invalid, we employ Arizona law. We refuse to consider this late request. An issue raised and argued for the first time in a reply brief arrives too late to warrant examination. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). We apply Washington law.

When seeking to invalidate the antenuptial contract, Daniel Cooper argues the agreement was void from the time of its signing and because the parties later failed to follow its provisions. As to its invalidity on inception, he contends no evidence shows that the drafting attorney informed him of his rights to property acquired during the marriage in the event of a divorce. He maintains that the parties only intended the agreement to protect assets from community creditors, and, therefore, the court should not enforce the prenuptial contract in a marital dissolution context. When arguing the

23

parties failed to govern their relationship by the agreement, he emphasizes commingling of incomes in joint accounts and using purported separate property to purchase property in both parties' names.

Prenuptial agreements purportedly promote marital tranquility and the avoidance of disputes about property in the future. *In re Marriage of Matson*, 107 Wn.2d 479, 481-82, 730 P.2d 668 (1986); *Friedlander v. Friedlander*, 80 Wn.2d 293, 301, 494 P.2d 208 (1972). Thus, public policy favors prenuptial agreements. *Friedlander v. Friedlander*, 80 Wn.2d 293, 301 (1972). If fair and fairly made, courts enforce prenuptial agreements. *In re Marriage of Matson*, 107 Wn.2d 479, 482 (1986). The burden of proof lies with the spouse seeking enforcement. *Friedlander v. Friedlander*, 80 Wn.2d 293, 300 (1972).

Prenuptial agreements are contracts subject to the principles of contract law, but special rules formulated by the Supreme Court temper the freedom to contract and restrain the public policy favoring prenuptial agreements. *In re Marriage of Burke*, 96 Wn. App. 474, 477, 980 P.2d 265 (1999). The parties to a prenuptial agreement form a unique bond and thus do not deal with each other at arm's length. *Friedlander v. Friedlander*, 80 Wn.2d 293, 301 (1972). Their relationship of mutual confidence demands the exercise of good faith, candor, and sincerity when entering the proposed agreement. *Friedlander v. Friedlander*, 80 Wn.2d 293, 301 (1972). Washington seeks to prevent abuse and overreaching by the dominant party. *In re Estate of Crawford*, 107

Wn.2d 493, 496, 730 P.2d 675 (1986); *In re Marriage of Matson*, 107 Wn.2d 479, 482

(1986).

When adjudging the validity of a prenuptial agreement, Washington courts harness

a two-prong test. *In re Marriage of Bernard*, 165 Wn.2d 895, 902, 204 P.3d 907 (2009).

In the first prong of the test, the party seeking enforcement must show that the agreement

provides a fair and reasonable provision for the opposing party, known as substantive

fairness. *In re Marriage of Matson*, 107 Wn.2d 479, 482-83 (1986). If the proponent

makes this showing, the inquiry ends, and the trial court must enforce the agreement. *In*

*re Marriage of Matson*, 107 Wn.2d 479, 482-83 (1986).

If the dissolution court rules the agreement to be substantively unfair, the court

moves to the second prong of procedural fairness. *In re Marriage of Matson*, 107 Wn.2d

at 482-83 (1986). This prong focuses on the circumstances surrounding the execution of

the agreement. *In re Marriage of Bernard*, 165 Wn.2d 895, 904 (2009). The party

seeking enforcement must prove procedural fairness by answering two questions in the

affirmative: (1) whether the spouses made a full disclosure of the amount, character, and

value of the properly involved and (2) whether the agreement was freely entered into on

independent advice from counsel with full knowledge by both spouses of their rights. *In*

*re Marriage of Bernard*, 165 Wn.2d 895, 902 (2009). Despite this black letter principle

requiring independent advice from counsel, Washington law does not absolutely require

independent counsel. *Whitney v. Seattle-First National Bank*, 90 Wn.2d 105, 111, 579

P.2d 937 (1978); *In re Estate of Crawford*, 107 Wn.2d 493, 496 (1986); *In re Marriage of Cohn*, 18 Wn. App. 502, 509, 569 P.2d 79 (1977). The analysis under the procedural prong involves mixed issues of policy and fact, and accordingly, review is de novo but undertaken in light of the trial court's resolution of the facts. *In re Marriage of Bernard*, 165 Wn.2d 895, 903 (2009).

Renu Sinha and Daniel Cooper's dissolution court did not reveal whether it based its ruling on substantive fairness, procedural fairness, or both. But the court entered some underlying findings with regard to the process behind entering the agreement. In turn, we resolve the appeal on procedural fairness. Although the standard instruction for assessing validity mentions reviewing substantive fairness first, we discern no reason to avoid the first step and move to the second prong. In *Kellar v. In re Estate of Kellar*, 172 Wn. App. 562, 291 P.3d 906 (2012), this court declined to address substantive fairness because it declared the prenuptial contract procedurally fair.

The Cooper-Sinha prenuptial agreement declared that each spouse disclosed to the other the full extent of his or her real and personal property. In *Kellar v. In re Estate of Kellar*, 172 Wn. App. 562 (2012), the parties' agreement confirmed full financial disclosure. Based on the contract provision and the lack of evidence of withholding information, this court, in *Kellar*, held, as a matter of law, that the agreement was procedurally fair. The court rejected, as creating issues of fact, the lack of any list of

assets and testimony from the wife's attorney of a recommendation to incorporate a list in the agreement.

Daniel Cooper and Renu Sinha supplied attorney Richard Duffield a complete list of their assets. Cooper does not contend that Sinha hid any property from him. Cooper knew at the time that Sinha worked as a physician and would command a higher salary than him.

The case on appeal differs significantly from all the reported decisions, wherein the party challenging the validity of the prenuptial agreement did not initiate the entry of the pre-marriage contract and typically signed at the last moment without any input into the terms of the agreement. The dissolution court found Daniel Cooper prompted the preparation of the prenuptial agreement. He possessed a desire to protect property he expected to inherit. Renu Sinha merely catered to Cooper's wishes. These facts alone show procedural fairness.

Daniel Cooper hired the attorney to draft the agreement. Two months before signing the prenuptial agreement, Cooper received a letter from the Arizona attorney, which read the attorney would prepare documents for two separate property trusts. Renu Sinha would place her earnings into her separate property trust. The attorney also mentioned the signing of a prenuptial agreement, wherein the earnings of each spouse would be that spouse's separate property.

One week before signing the antenuptial agreement, Daniel Cooper received by mail a copy of the trusts and the agreement. The letter accompanying the documents encouraged Cooper to review the prenuptial agreement before signing. The letter again warned that all property held before the marriage would remain separate property and all earnings and property gained during the marriage would become separate property. Cooper enjoyed the opportunity to question attorney Richard Duffield about his rights and obligations under the agreement. If he lacked confidence in the representation by Duffield, he possessed time to seek other counsel.

Daniel Cooper complains that Richard Duffield never advised him of the implications of the prenuptial agreement. Cooper adds that Duffield failed to review with him his rights in the event of a divorce. Cooper further, contrary to the dissolution court's findings of fact, asserts that he did not understand the agreement. He argues other purported facts inconsistent with the dissolution court's findings. Nevertheless, the dissolution court found him to lack credibility. At trial, he claimed he could not remember facts harmful to him, but he recalled with detail purported facts beneficial to him.

In *Kellar v. In re Estate of Kellar*, 172 Wn. App. 562 (2012), the wife sought to invalidate the prenuptial agreement on the ground that she received ineffective legal counsel. She added that, before signing the agreement, she did not understand her rights or the concept of separate and community property. This court rejected her contention

28

that procedural fairness required effective counsel. Independent counsel is not even required in all cases. Neither is a full understanding of the terms of the agreement. The law should not demand that a prospective spouse inquire into, weigh, and hold confidence in the adequacy of the other's understanding of the legal issues.

Daniel Cooper suggests that we reject enforcement of the antenuptial agreement because the parties only intended the agreement to shield assets from creditors and not to control division of property during a marital dissolution. He cites no authority for this proposition. This court need not address an argument that the party fails to support with cogent argument and briefing. *Schmidt v. Cornerstone Investments, Inc.*, 115 Wn.2d 148, 160, 795 P.2d 1143 (1990). In essence, Cooper wanted the court to uphold the terms of an agreement if and when he desired to shield assets from creditors, but not if he sought rejection of the agreement because it disadvantaged him during a marital dissolution. We do not value these inconsistent positions.

We move to Daniel Cooper's argument that the parties rescinded the prenuptial agreement by failing to comply with its terms. The party seeking enforcement must have made a good faith effort to abide by the prenuptial agreement terms during the marriage. 21 ELIZABETH A. TURNER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 16:3, at 413 (2022). The spouse seeking to enforce the agreement must show its observation in good faith. *Friedlander v. Friedlander*, 80 Wn.2d 293, 300 (1972).

Daniel Cooper cites two Washington decisions that address the failure to follow a prenuptial agreement: *In re Marriage of Fox*, 58 Wn. App. 935, 795 P.2d 1170 (1990) and *In re Marriage of Sanchez*, 33 Wn. App. 215, 654 P.2d 702 (1982). We discuss each.

Kenneth Fox appealed, in *In re Marriage of Fox*, an award of maintenance for three years and attorney fees to Luanne Fox. Before the marriage, Luanne received $179,172 from the estate of her first husband. In order to protect these assets, Luanne's attorney drafted an antenuptial agreement which each signed. The agreement provided the separate property of each would remain separate after marriage and, upon divorce, any community property would be divided equally. Each spouse waived all claims against "the other for property, support, attorney's fees, costs, or anything else whatsoever." *In re Marriage of Fox*, 58 Wn. App. 935, 936 (1990).

At the time Luanne Fox petitioned for a marital dissolution, she attended community college and worked part-time earning $350 per month. Kenneth Fox earned $41,000 annually plus significant fringe benefits. Kenneth, having forgotten the terms of the antenuptial agreement, paid Luanne temporary maintenance for several months before moving pretrial to vacate the award. The dissolution court stayed his motion pending trial. After trial, the court found Luanne had transferred all her separate funds during the marriage to the joint community checking account. The parties spent the funds on improvements to the family home awarded to Luanne and living expenses. Kenneth

inherited $36,000 during marriage which he also placed in the joint account and which defrayed living expenses.

On appeal, Kenneth Fox assigned error to the dissolution court's ruling voiding the prenuptial agreement from its beginning and also declaring the agreement rescinded. This court agreed with Kenneth that the agreement was valid when executed. We then reviewed whether the parties rescinded the contract. The evidence and unchallenged findings showed the parties did not mutually observe the antenuptial agreement. Kenneth contributed the full amount of his inheritance to the community joint account used for community expenses. Luanne Fox contributed her separate funds to acquire the parties' residence, improve the home, and meet community expenses. Kenneth forgot about the agreement at the commencement of the dissolution. The court held that this intent to abandon the agreement constituted a rescission and abrogation of the agreement in all its provisions.

In *In re Marriage of Sanchez*, Patricia and Manuel Sanchez executed an antenuptial agreement that each party's property acquired before marriage would remain separate. Each party also waived "any rights, powers or privileges which might or could arise by virtue of the marital relation . . . including community property rights . . . maintenance, . . . and any other statutory right . . ." *In re Marriage of Sanchez*, 33 Wn. App. 215, 216, 654 P.2d 702 (1982). Finally, the contract declared that, in the event of a divorce, each agreed to the recognition as to the status of property and would not seek

31

relief inconsistent with the terms of this agreement. The dissolution court characterized the parties' property according to the agreement. Nevertheless, the court divided the property equally.

On appeal, Patricia Sanchez assigned error by reason of the dissolution court failing to follow the prenuptial agreement. This court disagreed because the unchallenged findings showed the parties did not mutually observe it. For example, Patricia, after marriage, pawned a gold coin she owned before marriage. Manuel Sanchez paid premiums on Patricia's life insurance policies. He deposited his personal income into a joint account. Patricia asked for an award of spousal maintenance, an act inconsistent with the agreement.

Daniel Cooper asserts that no evidence established that the parties followed the prenuptial agreement. Cooper emphasizes that the dissolution court's comment that "neither side really contended that they paid much attention to incomes or the prenuptial agreement." RP at 2128. But this remark concerns contentions by the parties, not the transpired facts. Cooper adds that no evidence showed that the parties maintained their separate property apart from the community or the other party. He does not cite to the record, however, to demonstrate instances of commingling of property.

Daniel Cooper underscores that the parties deposited some of their separate property earnings into joint accounts and paid community obligations from the accounts. But this practice does not conflict with the prenuptial agreement. Paragraph 7 of the

contract read that the parties "may agree to establish joint bank accounts, in which event all sums deposited thereto shall become the joint or community property of the parties." CP at 73. This practice did not render income not deposited into the joint account community property. Paragraph 8 also anticipated later residences to be community property.

Some evidence shows the parties followed the prenuptial agreement. After executing the agreement and creating their respective trusts, Daniel Cooper transferred Fidelity securities to his Separate Property Revocable Trust and Renu Sinha conveyed her Arizona real property and Fidelity securities to her Separate Property Trust. She named the trust as the beneficiary of her IRAs and life insurance. Sinha kept separate disability policies and retirement accounts. Consistent with the antenuptial agreement, Sinha deposited her disability payments, deemed separate property, into a trust account in her name only. She removed some funds from trust account later and placed those funds in a joint account to pay some of the couple's living expenses. Daniel Cooper opened financial accounts under his own name to deposit income from his gem business, a practice that conformed to keeping some of his earnings as his separate property.

Renu Sinha, unlike Kenneth Fox, did not ask the dissolution court for relief inconsistent with the antenuptial agreement. She remembered the agreement at the commencement of the dissolution.

In 1998, the parties amended the trust documents that were companion to the prenuptial agreement. Daniel Cooper, with the assistance of Richard Duffield, incorporated his gem business. These actions also confirm the parties' continued recognition of the prenuptial agreement. Thus, we conclude that the dissolution court did not err when finding that the parties did not revoke the agreement by failing to follow it.

We note that the dissolution court found that the parties followed the agreement "to the extent that they understood it." RP at 2141-42. The law mentions conforming to the agreement, not conforming to the agreement to the extent one understands at meaning. Still, logically speaking one can purposefully follow an agreement only to the extent one comprehends its meaning.

## INTERPRETATION OF PRENUPTIAL AGREEMENT

Daniel Cooper argues that the 1996 prenuptial agreement did not preclude awarding one spouse the separate property of the other spouse in the event of divorce in order to fashion an equitable division of property. He further contends that the contract did not prohibit the dissolution court from awarding spousal maintenance. For now, we only address whether language in the agreement precludes an award of separate property to the other spouse.

The Cooper-Sinha antenuptial agreement declared that all property owned by each party at the time of marriage shall remain forever and a day the sole and separate property of that party. The other spouse waived any interest in that separate property. The

34

prenuptial agreement further declared that all earnings and income of one spouse shall remain that party's separate property. In turn, the other spouse relinquished, disclaimed, released, and forever gave up any right, claim, or interest in or to the property, including community property rights, dower interests, and rights as an heir or surviving spouse.

Daniel Cooper highlights that courts will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is explicitly stated. *Pasco Police Officers' Association v. City of Pasco*, 132 Wn.2d 450, 462, 938 P.2d 827 (1997). He characterizes a division of property in a marital dissolution to be a statutory right. Nevertheless, he forwards no law that designates one spouse has a statutory entitlement to the earnings of the other spouse such that those earning must be treated as community property. More importantly, Cooper cites no law that identifies a claim on the other spouse's separate property to be a statutory right. To the contrary, RCW 26.09.080 directs the trial court to consider awarding separate property to the owner of the property.

The prenuptial agreement language reads broadly enough to encompass awarding each spouse his or her own separate property. The agreement contemplated its application in the context of a marital dissolution because of paragraph 8 that directed an even split of community property. No case law requires any specific language in the prenuptial agreement so that separate property remains the property of the spouse at a marital dissolution.

No. 38609-1-III,
*In re Marriage of Cooper & Sinha*


DIVISION OF PROPERTY

The dissolution court ruled the prenuptial agreement valid, but then ignored its terms and divided the couple's property in an equitable manner. Renu Sinha assigns error to refusing to enforce the terms of the agreement. Sinha argues that the trial court should have awarded each spouse her or his separate property. Thus, the dissolution court should have awarded her all of her retirement accounts. We agree. The dissolution court erred when failing to award each spouse his or her separate property.

In Washington, the law assigns the dissolution court with ordering equitable relief to the divorcing spouses. RCW 26.09.080-.090; *Holm v. Holm*, 27 Wn.2d 456, 457-58, 178 P.2d 725 (1947); *In re Marriage of Barone*, 100 Wn. App. 241, 245-46, 996 P.2d 654 (2000). Equitable principles fall to contract rules, however. *In re Marriage of Mueller*, 140 Wn. App. 498, 167 P.3d 568 (2007).

Despite Daniel Cooper's protest to the contrary, a procedurally fair agreement will be enforced regardless of any substantive unfairness. *In re Marriage of Bernard*, 165 Wn.2d 895, 902-3 (2009); *In re Marriage of Matson*, 107 Wn.2d 479, 482-83 (1986); *Kellar v. In re Estate of Kellar*, 172 Wn. App. 562 (2012); *In re Marriage of Foran*, 67 Wn. App. 242, 249, 834 P.2d 1081 (1992). The party signing a prenuptial agreement waives any right to a claim against the separate estate of his spouse except as allowed under the agreement. *In re Marriage of Foran*, 67 Wn. App. 242, 249-50 (1992). No

36

Washington decision has held an antenuptial agreement void solely on substantive unfairness.

Daniel Cooper also justifies the dissolution court's award to him of separate property of Renu Sinha, despite the language in the prenuptial agreement, because the court could have granted him more of the community property in place of some of Sinha's separate property. We disagree. Paragraph 8 of the prenuptial agreement dictated that, on marital dissolution, the court must equally divide the community property. This provision of the agreement bears as much force as the provision addressing separate property.

## CHARACTERIZATION OF PROPERTY

Based on the terms of the prenuptial agreement, each spouse is entitled to his or her separate property. We agree with Renu Sinha that the dissolution court erred when failing to award her the retirement accounts funded by her earnings. The court should award Sinha the 401k account held by TIAA-CREF ending in *0526, the Thrift Savings Plan account ending in *3150, the Fidelity rollover account ending in *6512, the Fidelity rollover account ending in *1173, the Principal IRA account ending in *4004, the Fidelity IRA account ending in *8445, the Fidelity IRA account ending in *8453, the Fidelity Investment account ending in *8461 and other assets, including life and disability policies listed on paragraph 11 in the findings of fact. The court should award

to Daniel Cooper the accounts in his name and other assets listed in paragraph 10 of the findings of fact. The dissolution court should award no equalization payment.

Renu Sinha contends the dissolution court erred when characterizing the Fidelity Simple IRA *5053, the E-Trade account *6788, and Gemcuts International's business accounts as Daniel Cooper's separate property. She argues that Cooper stipulated to the Fidelity Simple IRA and the E-Trade account being community property. She also maintains that Cooper admitted to the commingling of the Gemcuts International business accounts with the couple's community property.

In support of her argument that Daniel Cooper agreed to the community nature of the two accounts, Renu Sinha cites to an August 12 pretrial management report in which the parties listed assets, the value of the assets, and the characterization of the assets. We agree that Cooper, in the report, agreed that both accounts constituted community property. Therefore, the dissolution court should have equally divided the two accounts in accordance with the prenuptial agreement. Cooper does not defend in his brief the purported separate property character of the two accounts, but instead only argues that any error was harmless because the court remained free to equitably award assets to the parties regardless of their community or separate nature.

Gemcuts International maintained the following bank accounts: Chase checking account *2120, Chase savings account *1379; and Bangkok account *0592. During trial testimony, Daniel Cooper agreed to the use of the two Chase accounts for family

38

expenses.  He agreed the accounts constituted community property.  He also so stipulated in the pretrial management report.  We agree with Renu Sinha that the dissolution court erred when adjudging the accounts to be Cooper's separate property.  The trial court should have equally divided the two accounts.  The undisputed evidence at trial showed the Bangkok account to be empty.  Because the account contains no money to distribute, its characterization is irrelevant.

Gemcuts International Valuation

The dissolution court awarded to Daniel Cooper, as his sole property, Gemcuts International and valued the business at $100,000.  On appeal, Renu Sinha complains that the court attributed an unreasonably low value to the gem business.  Sinha forwards the argument in order to establish that the assets distributed to Cooper possessed a higher value than assessed by the court.  Because the court directs the dissolution court to divide the couple's assets in accordance with the prenuptial agreement and because Cooper will continue to receive the gem business as his separate property, the valuation of the business lacks any relevance to the property allocation.  Nevertheless, because the dissolution court may consider the business value when awarding spousal maintenance, we address Sinha's assignment of error.  We conclude that, if any error occurred, the error favored Renu Sinha, not Daniel Cooper.

This reviewing court will affirm a property valuation that is within the range of the evidence presented.  *In re Marriage of Rockwell*, 141 Wn. App. 235, 250, 170 P.3d 572

(2007); *In re Marriage of Sedlock*, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993). If the

parties offer conflicting evidence in the valuation, the court may adopt the value asserted

by either party or any value in between the two. *In re Marriage of Rockwell*, 141 Wn.

App. 235, 250 (2007). Renu Sinha argues that, when the trial court assigns a value to an

asset that is not within the range of the evidence presented, the valuation is not supported

by substantial evidence and must be reversed. *In re Marriage of Soriano*, 31 Wn. App.

432, 435, 643 P.2d 450 (1982).

The dissolution court did not indicate how it arrived at a business valuation of

$100,000. Both expert appraisers testified that Gemcuts International lacked any value as

a going concern, sometimes known as goodwill. Both experts limited the gem business's

value to the gems, gem equipment, and financial accounts. The experts only disagreed as

to the date of valuation. The dissolution court awarded Daniel Cooper all of the Gemcuts

gems as his separate property, assuming the gems did not otherwise belong to Cooper

personally. The dissolution court also awarded Cooper the financial accounts of the

business. Thus, if the dissolution court included the value of the gems and the accounts

in the total value of assets awarded to Cooper, the court should have, under the

undisputed facts, assigned no value to Gemcuts International. In such event, the court

assigned $100,000 to Cooper more than should have been assessed to him. The higher

valuation decreased the amount of the equalization payment required of Renu Sinha.

We cannot tell by the record whether the trial court included the value of the Gemcuts gems and financial accounts in the total allocation of value to Daniel Cooper at the time of the division of the property. Because we are remanding to the dissolution court for further proceedings, we direct the dissolution court to resolve this discrepancy. The court should not assign any value to Gemcuts International beyond the value of the gems, equipment, and financial accounts.

Spousal Maintenance

On appeal, Renu Sinha assigns error to the dissolution court's award of spousal maintenance to Daniel Cooper. She argues that the prenuptial agreement precluded any award of maintenance and that the dissolution court must uphold this provision of the agreement. Cooper counters that the agreement does not prevent an award of spousal maintenance, and, even if it did, the dissolution court may ignore the contract and award maintenance pursuant to the terms of RCW 26.09.090. Cooper cross appeals the dissolution court's award to him as being insufficient.

We conclude that the prenuptial contract did not bar an award of spousal maintenance. Under paragraph 6 of the agreement, each spouse released any claim to dower rights, rights as a surviving spouse, election to take under a will, an award in lieu of homestead, and a family allowance. A family allowance, like the other rights waived under the paragraph, only arises at the time of the death of the other spouse. RCW 11.04.250; *In re Estate of Hein*, 17 Wn. App. 2d 243, 258, 485 P.3d 953 (2021); *JP*

*Morgan Chase Bank, NA v. Unknown Heirs of Porter*, 16 Wn. App. 2d 591, 595-96, 481 P.3d 1114 (2021); *In re Estate of Westall*, 4 Wn. App. 2d 877, 887-88, 423 P.3d 930 (2018). The paragraph does not mention any relinquishment of the opportunity to seek maintenance during a marital dissolution.

Renu Sinha may contend that the antenuptial agreement's reserving to each party his or her income as separate property necessarily prevents an award of maintenance since payment of the award must come from her separate income. We disagree that the language so reads.

In *Platts v. Platts*, 45 Wn.2d 853, 278 P.2d 679 (1954), the Supreme Court ruled that the divorce court did not err when awarding the wife maintenance despite the parties having signed a prenuptial agreement. The agreement read that the separate property of each and the increase from the separate property would remain the separate property of the owner. Also, property acquired thereafter would be the separate property of the spouse in whose name the property was acquired. The contract read that each party relinquished any claim to the other's property. In affirming the alimony award, the Supreme Court characterized maintenance as distinct in nature from property. The court emphasized that the antenuptial agreement failed to expressly address the subject of alimony in the event of a divorce. In contrast, in *Kellar v. In re Estate of Kellar*, 172 Wn. App. 562 (2012), the parties, in their prenuptial agreement, expressly waived "the right to pursue spousal maintenance." *Kellar v. In re Estate of Kellar*, 172 Wn. App. at 569-70.

The prevailing view upholds an express waiver of spousal maintenance, but only if the waiver does not render the spouse a public charge. *Hardee v. Hardee*, 585 S.E.2d 501 (S.C. 2003); *Frey v. Frey*, 471 A.2d 705 (Md. 1984); *Cary v. Cary*, 937 S.W.2d 777 (Tenn. 1996); *Brantley v. Brantley*, 814 S.E.2d 787 (Ga. Ct. App. 2018); *McAlpine v. McAlpine*, 94-1594 (La. 9/5/96), 679 So. 2d 85; *Ex parte Walters*, 580 So. 2d 1352 (Ala. 1991); *Austin v. Austin*, 445 Mass. 601, 839 N.E.2d 837 (2005); *Lentz v. Lentz*, 271 Mich. App. 465, 721 N.W.2d 861 (Mich. Ct. App. 2006); *In re Marriage of Thomas*, 199 S.W.3d 847 (Mo. Ct. App. 2006). Some facts suggest that Daniel Cooper will be unable to support himself after an award to Renu Sinha of all of her separate property.

The dissolution court did not err in granting Daniel Cooper spousal maintenance. Nevertheless, because we remand for the court to divide assets in accordance with the antenuptial agreement, the court should readdress the amount of maintenance. A smaller property allocation to Daniel Cooper may merit a higher award under the spousal maintenance factors found in RCW 26.09.090.

In cross-appealing the dissolution court's award of spousal maintenance. Daniel Cooper contends the award fails to fulfill his needs and thus is unreasonably low. He also assigns error to the dissolution court's tying his maintenance to the income of Renu Sinha and the end of support with the passage of time. Cooper may reargue these points before the dissolution court on remand.

In arguing the dissolution court correctly awarded him spousal maintenance but imposed a low figure, Daniel Cooper characterizes himself as "virtually unemployable." Br. of Resp't/Cross Appellant, at page 1. Based on substantial evidence, the trial court found Cooper to be employable. Cooper does not assign error to this finding. On remand, we do not expect the dissolution court to revisit its finding of the employability of Cooper.

## Attorney Fees

On appeal, Daniel Cooper seeks an award of reasonable attorney fees and costs under RCW 26.09.140. The statute allows the court to order one spouse to pay the fees of another spouse based on need. The statute extends to fees and cost on appeal. Because we are remanding the proceeding, we direct the trial court to address what, if any, attorney fees should be awarded Cooper, including fees incurred on appeal. The dissolution court can better assess Cooper's needs after a corrected allocation of property and a new decision on spousal maintenance.

## CONCLUSION

We remand this marital dissolution proceeding. On remand, the dissolution court should allocate to the parties their respective separate property. The court should also reconsider the valuation of Gemcuts International, spousal maintenance to be paid to Daniel Cooper, and any attorney fees to be awarded Cooper. In addition, the court shall otherwise enter new rulings consistent with this opinion.

44

No. 38609-1-III,
*In re Marriage of Cooper & Sinha*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.